LANE, SMITH AND BARG *v.* STATE.

4600                                                     229 S. W. 2d 43

Opinion delivered April 10, 1950.

Rehearing denied May 8, 1950.

*Bruce Ivy* and *Claude F. Cooper*, for appellant.

*Ike Murry*, Attorney General, and *Arnold Adams*, Assistant Attorney General, for appellee.

GRIFFIN SMITH, Chief Justice. Indictments charged the three defendants with burglary and grand larceny. Each was convicted and sentenced to serve penal terms of seven years for burglary and fifteen years for grand larceny. The motion for a new trial lists sixty-three matters in respect of which error is urged. Eleven are discussed in the briefs.

On the night of June 26th, 1949, a metal safe was taken from the store of R. H. Wilmoth at Etowah. It was found in a ditch near the highway four miles away. Indications were that it had been opened with a sledge hammer. Wilmoth testified that the safe contained $2,285 in money and $446 in checks. Some of the checks were recovered later, but none of the money.

. . . . .

Thomas K. Morrow, familiarly known as ''Sonny,'' is known in Mississippi County as a professional gambler and criminal suspect. He met Jack Barg while in Detroit in 1942 or 1943; but in 1949 Barg was in Chicago. Morrow met Martin Lane in January, 1949, and in June of that year he became acquainted with Harry Smith. The circumstances were that Barg, telephoning from Chicago, had tried to get in touch with Morrow. The call was answered by Morrow's mother-in-law, who relayed the message in a manner permitting arrangements for a meeting of the four—Barg, Lane, Smith, and Morrow—at State Line, a point marking the boundaries of Arkansas and Missouri. Morrow testified that after

he was introduced to Smith, either Barg or Lane asked if he knew of a place they could "knock off", explaining that they would like to make some "fast money". Morrow had formerly played poker at London, Kentucky, at a public place operated by George Henderson, who was supposed to be informed regarding safe-cracking opportunities, so they drove to London and talked with Henderson, who had "backed out". Returning, they stopped at Morrow's home at Holland, Mo., then some or all of them went scouting for likely-looking places to rob. Morrow had been joined by his wife. At Manila they stopped at a medical clinic for Barg to make a date with Irene Rice, whose testimony was a feature of the trial.

Half a mile south of Floodway, on the road to Etowah, Morrow and his wife, with Barg and Smith, went into Homer Starnes' store to see if they could spot an available safe, but if Starnes owned a safe the party "didn't locate it". Ten or fifteen minutes later they were in Etowah. Smith went into Wilmoth's store, returning with the explanation that the safe there "looked like a cinch". He had asked that a $20 bill be changed. After "casing" the store they went to Manila and killed time at the Legion Hut, ascertained that Irene Rice could not leave her employment until eight o'clock in the evening, and then went to Morrow's home at Holland. When Irene joined them considerable time was spent drinking beer and whiskey, but at a late hour Barg reminded them that business came before pleasure.

At 2:30 a. m. Barg, Lane, and Smith changed their clothing, preparatory to the business at hand. Morrow drove his car. In the Dodge that followed were Lane, Smith, and Barg. Morrow testified that after driving through Etowah he was overtaken and instructed to go back a short distance and wait. Approximately thirty minutes later the three reappeared with the safe in the "turtlehull of the car". It was unloaded at the point where it was found in the ditch. Morrow, who moved on when the safe was dumped, said that he did not see it opened, but heard sounds like a hammer on metal. All went to Morrow's home. Morrow was told by Lane that

the haul had netted between twelve and fourteen hundred dollars, and he (Morrow) was given $200. He and his wife took Irene part of the way to her place of employment, but when they returned Barg, Lane, and Smith had gone. They were overtaken at Cairo, where "motel" accommodations had been engaged for the night, but Morrow did not see Lane at that time. Barg and Smith called at his cabin, where Barg made the threat that anyone who "snitched" on him would be killed. Morrow and his wife returned to Mississippi County where they remained for two or three days and then left for California. Some time later they were arrested at Salinas and brought back. While in jail Morrow confessed. Charges against Mrs. Morrow were dismissed. At the time of trial Morrow was under bond.

The defense of each was an alibi.

The State contends that circumstances attending the arrests of appellants are in themselves evidential. Miss Eunice Brogdon is a deputy in the office of Sheriff and Collector William Berryman. She testified that on July 20th the sheriff told her to call Jack Curtis in Chicago, "Sacramento 29498." In response a man answered the telephone and said he was Jack Curtis. Miss Brogdon told him she was "Mrs. Lee—Opal's mother". "Curtis" said he was anxious to get in touch with "Sonny", that it was important; and Miss Brogdon replied, "Well, he talked with me last night and they are in Mississippi, but will be home Saturday night or Sunday". Miss Brogdon then inquired if he (Curtis) could be reached, and how. The reply was that a call placed Saturday night or early Sunday would be appreciated. "Curtis" told Miss Brogdon that he was a very good friend of "Buddy's and Opal's", and that he had stayed at their home "a little while ago". He then gave two telephone numbers, but explained that his name was not Curtis, but that it was Jack Barg. The numbers were "Nevada 20716 and Nevada 20721". Sunday morning Miss Brogdon placed a call as directed. The voice of the man who answered was similar to that of the person who gave her the telephone numbers, and she definitely recognized that the person who then said he was Barg was the same

one who had first said he was Curtis, but had explained that he was Barg.

In this conversation Miss Brogdon said she was "Opal", (Morrow's wife). Barg wanted to know where Sonny was, saying he had to get in touch with him. Miss Brogdon replied, "Sonny didn't come: things are hot around here". Barg insisted that he had to contact Sonny. Miss Brogdon then said, "Well, Sonny is going to meet Irene and me at Sutton's Tourist Court Monday night at ten o'clock, and he wants you to meet us—can you?" Barg replied that he would. Miss Brogdon asked Barg if he knew where the place was. He replied that he was not certain, but when asked whether he knew where the "Spot" was Barg said he did, or in any event he could find it. Finally Miss Brogdon said: "Sonny said bring your tools and the other guys with you—you know what I mean?" The reply was, "Yeah, I know what you mean, [but] what kind of a job is it? Is it the same kind of a job we did before?" The answer was, "Well, I don't know whether it is or not: Sonny doesn't talk very much, you know, but it is something good". He then said, "I get you".

Acting upon the information given by Miss Brogdon, the Sheriff and his deputies, assisted by State Policemen, stationed themselves at Sutton's Tourist Court, cabin No. 3 having been reserved in the name of Opal Morrow and Irene Rice. The appellants were arrested when they drove into the tourist court area in search of the two women and Sonny.

At trial Lane was the only defendant who testified. He is Barg's second cousin. Shortly before June 26th he was told that a night club known as The Winking Pup was for sale. Investigations revealed that it was a corporation and that Harry Smith owned twenty shares of sixty-three that constituted controlling interest. Lane spent two or three days checking the business done by Winking Pup, such as counting customers, analyzing receipts as reflected by the cash register, estimating the cost of operation, etc. On Friday, June 24th, he told Smith that he would buy the twenty shares, but did not

want to close the deal until Saturday morning. Actually he did not take over until Saturday afternoon. In explaining this delay the witness said: "When we got back that evening there were some beer men coming in, and whiskey men making last-minute deliveries, so we let them get through with their business. Smith then took me into the office and showed me around—showed me where the stocks were kept, and a few other things people would be interested in if they were getting into the business. Harry's brother George was there, as was Harry".

The so-called burglary tools found in appellants' car when they were arrested [said Lane] were probably put into the tool compartment by a contractor who had been doing some work for "Winking Pup". The car was bought July 10th or 11th. It was a Chrysler, on which the down payment of $1,000 was made in cash. Lane thought that the three pairs of gloves might have been left on some occasion when mechanics worked on the car, or perhaps one pair was for use in driving.

Barg was the only one of the three who admitted being in this State when the crime was committed. The explanation was that he intended to purchase stock in Winking Pup. He was hopeful that relatives living in Arkansas—his father and an uncle — would advance money for the venture. Testimony corroborating Lane's alibi for himself and Smith placed them in Chicago when the burglary was committed. Its substantial nature could not be questioned here had the jury believed the witnesses. On the other hand, the defendants were definitely identified as having been seen with Morrow and elsewhere at the critical times spoken of by him, hence on the factual issue the evidence is not open to legal criticism.

Initially the appellants complain (a) that they were arrested without warrants, and (b) that they were denied preliminary hearings. The State's answer (a) is that an officer may make an arrest without a warrant where he has reasonable grounds for believing that the person arrested has committed a felony. Ark. Stat's

§ 43-403. It is true (b) that preliminary hearings were not given, but it is equally true that the defendants were released on bond in August, this Court having refused to reduce the amounts fixed by the trial Judge. Condition of the bonds was that the defendants would answer to Circuit Court October 17th on the charges brought against them by *information*. The charges alleged possession of burglary tools—an accusation not brought forward in the indictments, although as to Barg one bench warrant recites that he was being held on a charge of possessing burglary tools, while a second warrant mentions burglary and grand larceny.

Appellants say that their motion to quash the indictments should have been sustained because the Court's minutes or records did not affirmatively show that the indictments were returned in open Court in the presence of the Grand Jury, nor was it shown that twelve of the jurors voted to indict; and, secondly, there was no legal evidence presented to the Grand Jury upon which it could base true bills.

The indictment was indorsed, "Returned into open Court, in the presence of all the Grand Jury, by the foreman thereof, and filed this 17th day of October, 1949". In passing on the motion Judge Harrison dictated a statement to the Court Reporter, the substance of which might well have been taken from the docket. After mentioning organization of the Grand Jury and the directions that it proceed to business, the statement is: "Later on the same day the Grand Jury, with an officer in charge, came into Court and reported two true bills of indictment. Same were presented to the Court and filed, and the Clerk was directed to issue bench warrants thereon at the direction of the Prosecuting Attorney." We think the vices mentioned in *Green* v. *State,* 19 Ark. 178, and in *Shinn* v. *State,* 93 Ark. 290, 124 S. W. 263, were overcome.

Complaint is made that the Court overruled a timely motion to require the Prosecuting Attorney to file a bill of particulars. The gist of the motion was a request for details regarding the brand, manufacturer's number,

and other matters pertaining to the tools alleged to have been used in opening the safe. The Court directed the Sheriff to permit a complete inspection. This was sufficient. We do not discuss the request for copies of petitions that had been filed at a time when the charges were by information. These charges were superseded by the indictments, and no practical purpose can be served by speculating on what rights might have been lost if the trials had been conducted under charges filed by the Prosecuting Attorney.

The Court did not abuse its discretion in overruling motions for severance. Appellants' counsel concedes that the trial Court was within its legal rights in directing that the three be tried together. But, say appellants, the fact that they were non-residents of Arkansas and were friendless in a jurisdiction where public sentiment might with reason be calculated to favor the store owner whose safe was taken justified recognition by the Court that there should be an exception to the rule. Under the State's theory, and under substantial facts acted on by the jury, the transaction was a single undertaking participated in by all, and if guilty they had necessarily conspired to commit a felony. Ark. Stat's, § 43-1802, and Notes on Decisions.

It is next argued that the Court abused its discretion in not granting a continuance. The reasons assigned are cumulative, including, as it is asserted, a denial of preliminary hearings, failure of the trial Court to hear a petition for *habeas corpus,* unexpected rearraignment, and the imposition of new bonds. If, as the appellants say, the Court refused to consider their petitions under *habeas corpus* procedure, their rights were reviewable by this Court through *certiorari. Adams* v. *Pace,* 193 Ark. 1020, 104 S. W. 2d 212. An allegation that the lower Court had arbitrarily or indifferently refused to hear the petition would be considered here as expeditiously as though an abusive exercise of power formed the basis of complaint. Ordinarily, however, where one is admitted to bail and the conditions are not such that his movements are restricted, he will not be heard to say

that he is being illegally restrained. *Stallings* v. *Splain*, 253 U. S. 339, 64 L. Ed. 940, 40 S. Ct. 537.

The petition for a writ of *habeas corpus* was filed October 14th—three days before Circuit Court convened. When the indictments were returned on the 17th the petition of October 14th was amended. While in their brief appellants assert that immediately following the indictments the amended petition was filed, and that they were not able to get it heard, the record shows that the petition was not sworn to until the 18th, and the Clerk's attestation shows that it was filed the 18th—the same day new bonds were executed and the defendants released  The inference that the petition was filed on the 17th is not sustained.

Following the preliminary proceedings just mentioned the cases were set for October 25th. On that date the defendants asked for a term continuance, or in the alternative postponement to another day of the same term. There is the contention that the Court refused to hear testimony in support of the motion. In passing on the motion Judge Harrison mentioned that it was verified, then said: "I am holding there is no legal ground for allowance of the motion". This was in response to a defense attorney's statement that "I have got some proof to show the reasons as set out in the motion. I can't get the witnesses in Court, but I can take the deposition". After the motion had been overruled, the attorney said, "What about my missing witness", and the Court's ruling was, "I don't think the record shows due diligence was used to get him here".

The objection in respect of which there was an exception goes to the single point of the absent witness and the general statement that proof in support of the formal motion could be submitted. But the Court treated the statements as true, and held as a matter of law that good cause had not been shown. Crux of the controversy was the inability of the Pulaski County Sheriff to serve a subpoena on Joe Ruff. In making an objection a defense attorney said it was his belief that the subpoena was sent from Osceola October 15th. A Clerk's deputy testified

that the request was not made until October 22d. A letter accompanied the Pulaski County Sheriff's return, stating that Ruff was out of the city and would be for several days. There was testimony that this letter was given to one of the attorneys for the defendants. We agree with the trial Court that the motion should have been denied.

Assignment No. 5 complains of the Court's refusal to suppress evidence thought to have been illegally procured. To this end rules of Federal practice are invoked. It is sufficient to say that our own decisions support the trial Court in the particulars pointed to.

Assignment No. 6 involves transactions treated under other headings.

When the Prosecuting Attorney (Assignment No. 7) asked that Allen Levin be recalled for additional cross-examination, a courtroom colloquy brought the comment from a Deputy Sheriff that "One of these witnesses is back there—this Russian Jew." On objection that the remark, made in the presence of the jury, was prejudicial, the Court told the jury that it was "highly improper and ought not to have been made, and you are told not to consider it for any purpose or under any circumstances." There was no objection that the admonition was insufficient.

Under Assignment No. 9 there is complaint of what the defendants insist was the trial Court's partiality in asking, from time to time, whether certain testimony would be objected to by the State. It is said that on seventeen occasions "objections" were interposed by the Court. Our examination of the records shows that when collateral matters were being discussed, and when the particular subject had been pursued to a point beyond relevancy, the Court asked if there was an objection. It is not contended that the rulings were in all cases erroneous, but that the Court's careful attempt to restrict the examinations to essentials created an impression in the minds of jurors that the Court believed the defendants were guilty.

It is the Court's duty, irrespective of objections or the want of them, to see that a trial is conducted along

orderly lines. Certainly nothing suggestive of a personal opinion regarding the facts should be said or even intimated, and complete freedom from bias must prevail insofar as attitude may be said to be reflected by word, inflection, or intimation. But this does not mean that a Court cannot restrain what are sometimes spoken of as "fishing expeditions," or tedious repetition of questions when the subject has been exhausted, and like conduct. We do not find that the complaints of judicial prejudice are justified.

In Assignment No. 9 appellants ask that prejudice be predicated upon that part of the Sheriff's testimony in which he detailed how the telephone numbers given to Miss Brogdon were procured by him from Mrs. Lee. Admission of this evidence [appellants say] was the foundation upon which Miss Brogdon's testimony (characterized as hearsay) was predicated. In the brief it is said: "Miss Brogdon specifically [testified] *that she does not know to whom it was she was talking.*" The quotation is lifted from its connected position. What the witness said was that she called by telephone after the numbers were given to her, that a man who said he was Jack Curtis talked, and in doing so mentioned things disclosing information regarding people and places in Mississippi County and adjoining Missouri; that he later explained that the real name was Jack Barg, and that she (Miss Brogdon) distinctly identified "Curtis" and "Barg" as the same person because the voice was the same.

By Assignment No. 10 it is contended that reversible error occurred when the Prosecuting Attorney, on cross-examination, was permitted to refer to defense witnesses as "Jews, Russian Jews, and Just Plain Jews." (Transcript pages cited are 513-19-35-46, and 610.)

The expression does not appear in the cross-examinations as a single phrase. This is made clear when the exact language is read, showing questions and answers. It is always improper to gratuitously comment on any personal matter not essential to the controversy and not collaterally important, when in doing so the questioner

or commentator discloses a scornful attitude or assumes a derisive manner. It must be presumed that if this had been done in the case at bar an appropriate admonition would have been given by the Court. Whether such reproval would have been sufficient to erase the harm cannot be determined here because the issue is not properly presented.

There had been testimony that in conversations between themselves and otherwise the defendants spoke a language not understood by the witnesses who testified for the State. Allen Levin, when asked if he spoke any foreign languages, replied that he spoke "his native tongue, Jewish." He also spoke Yiddish very well. The questions were objected to.

George Smith (defendant Harry Smith's brother) was asked if he spoke Yiddish and replied that he did not. Question: "What is your nationality?" A. "Russian." Q. "Russian Jew?" A. "No, Russian." Q. "Not a Russian Jew, Mr. Smith?" A. "No." Following action of the Court in overruling an objection at this point, the Prosecuting Attorney added: "The question I asked you was whether you speak Russian [or] Yiddish: do you understand Russian?" A. "I understand very little Russian. As far as speaking it, I haven't spoken Russian since my mother died. I don't know much about it."

Edward Abbess, a defense witness, testified that he was born in Texas, but went to Chicago in 1926 and knew Martin Lane—"just got acquainted with him there at the Winking Pup." Question: "What is your nationality?" A. "Mexican." Q. "You don't happen to speak a little Russian or Yiddish, do you?" A. "No, sir."

Louis Miller was a bartender on South Crawford street, two or three blocks from Winking Pup. He was asked if he spoke Yiddish and replied that he did not. Question: "What is your nationality?" A. "Jewish." Q. "Russian Jew?" A. "No, I was born here in the United States." Q. "Just plain Jew?" A. "That is right." When an objection was interposed the Prosecuting Attorney said, "I mean by that you are not from Russia."

Lane testified that he spoke some French, a little Italian, and "a sprinkling of Pig Latin." There had been testimony that one or more of the defendants, while using the telephone, spoke in an unfamiliar tongue. It is quite clear that the Prosecuting Attorney had this background in mind while examining the witnesses, and in his summation of the cases.

It is next argued that the jury was improperly instructed regarding conviction on the uncorroborated testimony of an accomplice. Contention was that the Court failed to say that the evidence upon which a conviction rests must be *independent of and unaided by* the testimony of the accomplice.

The Court in express terms told the jury that Morrow and his wife were accomplices and that it would be necessary to find from other testimony facts supporting the accusations; and, [said the Court] . . . "the corroboration is not sufficient if it merely shows that the crime was committed and the circumstances thereof; but you are instructed that the amount of such corroborating evidence and its weight are matters solely for the jury; and if you find that such witnesses have been corroborated by the evidence, either positive or circumstantial, other than their own, tending to show that the crime was committed, and connecting the defendants, or either of them, with the commission, you will be justified in convicting the defendant, or defendants, so connected, provided you believe him guilty from all of the evidence in the case, and beyond a reasonable doubt."

The instruction, given in cases where there was substantial corroborating testimony, was correct. We are not cited to any decision requiring an instruction containing *independent of and unaided by.*

Many other matters are discussed in the 245-page brief and abstract appellants have filed, with citations to the 640-page record. None is of a character involving principles not settled by our decisions, hence a protracted discussion would be academic. All have been examined and prejudicial error is not shown.

Affirmed.