William L. MAXWELL, Petitioner,

v.

Dan D. STEPHENS, Superintendent of
Arkansas State Penitentiary,
Respondent.

No. PB 64 C 4.

United States District Court
E. D. Arkansas,
Pine Bluff Division.

May 6, 1964.

George Howard, Jr., Pine Bluff, Ark., Harold B. Anderson, Little Rock, Ark., for petitioner.

Jack L. Lessenberry, Little Rock, Ark., for respondent.

YOUNG, District Judge.

This habeas corpus proceeding is brought by William L. Maxwell, a Negro male, age 24, who was convicted for the crime of rape in the Circuit Court of Garland County, Arkansas, on March 21, 1962, and sentenced to death. The conviction was affirmed by the Arkansas Supreme Court in the case of Maxwell v. State, 236 Ark. 694, 370 S.W.2d 113 (1963), and following a denial of petition for rehearing the date of execution was scheduled for January 24, 1964. No application for certiorari was made to the United States Supreme Court. The instant action was filed on January 20, 1964, alleging that the state court conviction was obtained in violation of petitioner's constitutional rights guaranteed by the Fourteenth Amendment to the United States Constitution. Petitioner was permitted to amend his petition twice and a hearing was held on the petition, as amended, on February 12, 1964, as well as on February 27, 1964, at which time the testimony was concluded. Petitioner and respondent have submitted briefs in support of their respective contentions.

Throughout the state court proceedings, petitioner was represented by Mr. Christopher C. Mercer, Jr., a capable at-

torney experienced in this type of litigation.[1] Subsequent to the state court proceedings, and prior to this action, petitioner obtained the services of his present counsel who now represent petitioner in this habeas corpus proceeding. The question of Maxwell's guilt is not now before this court. Cf. Henslee v. Stewart, 311 F.2d 691 (8th Cir. 1963); Bailey v. Henslee, 287 F.2d 936, 939 (8th Cir. 1961). The circumstances of the crime and the evidence against Maxwell are fully discussed by the Arkansas Supreme Court in Maxwell v. State, supra, 236 Ark. 696–700, 370 S.W.2d 114–116. The only issue which now confronts this court is whether Maxwell's federal constitutional rights, in the particulars relied upon, were preserved in the state court action.

The alleged violations of petitioner's constitutional rights, in substance, are that: (1) Petitioner was illegally arrested and there was an unlawful search and seizure of his home and person; (2) Petitioner was tried in a hostile atmosphere; (3) Racial discrimination was practiced in the selection of the jury which tried petitioner; (4) There has been an unconstitutional application and enforcement of Ark.Stat. § 41–3403 (1947) against petitioner, and the death penalty upon conviction for rape provided by this statute is a "cruel and unusual" punishment contrary to the basic concepts of a civilized society. In this opinion, the Court will deal with these issues in the order mentioned.

### I. THE ARREST AND SEARCH

The offense with which petitioner was charged occurred about three o'clock in the morning of November 3, 1961. Approximately one hour later, petitioner was taken into custody by police officers at his parents' home where he lived. This was done on the basis of information and descriptions given by the victim to a Negro police officer, O. D. Pettis, now deceased. Sometime around five o'clock that morning police officers Captain Crain and Officer Timms made a trip back to petitioner's home in order to obtain some clothing belonging to petitioner allegedly worn during the commission of the offense; and another trip was made by Officer Timms later that same morning in order to obtain a change of clothing for petitioner. since arrangements had been made for the clothes allegedly worn by petitioner during the rape, and which petitioner put on when taken into custody, to be sent to the laboratory of the Federal Bureau of Investigation in Washington, D. C.

When petitioner was taken into custody he was viewed by the victim at a local hospital and subsequently identified as the assailant. Thereupon, petitioner was incarcerated in the City Jail and held until later during the afternoon or evening of November 3rd, when he was taken to the County Jail in nearby Malvern, where petitioner remained until November 6th. Petitioner signed a written confession while at the County Jail in Malvern and made another confession later in Hot Springs. Petitioner was then returned to the city of Hot Springs, where on November 7, he was formally charged by information with the crime of rape under Ark.Stat. § 41–3401 (1947).

No warrant for petitioner's arrest was issued prior to November 7th when petitioner was formally charged, and a warrant to search petitioner's home was never procured. On November 3rd, while petitioner was held at the Hot Springs City Jail, police officers combed petitioner's hair and obtained a nylon thread from his hair, as well as a specimen of his hair. The police officers obtained clothing from petitioner's person, as well as his home. Petitioner was not permitted to see his parents or a lawyer, and according to petitioner, he was mistreated and coerced into signing a con-

---

1. Mr. Mercer is a graduate of the University of Arkansas School of Law and was one of the attorneys who represented Lonnie Mitchell in a habeas corpus proceeding.

Mitchell v. Henslee, 208 F.Supp. 533 (E. D.Ark.1962) rev'd per curiam Case No. 17,208, 332 F.2d 16 (8th Cir. May 4, 1964).

fession. Petitioner now argues that the arrest, and the search of his person and home were illegal and constitute a violation of his constitutional rights.

### (a) *Petitioner's Arrest Without A Warrant*

■ The lawfulness of petitioner's arrest without a warrant must be determined by the law of Arkansas, subject to the test of reasonableness under the Fourth and Fourteenth Amendments to the United States Constitution. Ker v. California, 374 U.S. 23, 40, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1962). In Arkansas, it is provided by statute that an arrest without a warrant is authorized where the arresting officer has reasonable grounds for believing that the person arrested has committed a felony. See Ark.Stat. § 43–403 (1947). The Arkansas Supreme Court has held that where a felony has in fact been committed, an arrest without a warrant may be made where the officer has reasonable grounds to suspect the particular person arrested. Carr v. State, 43 Ark. 99 (1884). Knight v. State, 171 Ark. 882, 286 S.W. 1013 (1926). Lane v. State, 217 Ark. 114, 229 S.W.2d 43 (1950). Trotter and Harris v. State, 237 Ark. 820, 377 S.W.2d 14 (1964).

At the time of petitioner's arrest, the fact that a felony had been committed was clearly established. Miss Stella Spoon had been brutally raped and her 90 year old father with whom she resided had been mercilessly struck and left bleeding when he attempted to aid her. Miss Spoon had given a description of her assailant to Officer Pettis, the Negro city policeman, and had further told him that her assailant had said that his name was "Willie C. Washington".[2] The first suspects brought to the hospital for Miss Spoon to identify were Willie C. Washington, Sr., Willie C. Washington, Jr.,

and another Negro. Miss Spoon told Officer Pettis that none of these individuals was her assailant, but she gave Pettis some additional descriptions which she was better able to do by comparison of her attacker with Willie C. Washington, Jr. Officer Pettis then indicated to Miss Spoon and the other policemen in her room that he knew the identity of her assailant. Petitioner was then taken into custody and was the next person brought to Miss Spoon's hospital room for her to identify. When petitioner was brought into Miss Spoon's hospital room, according to the testimony of Officer Timms at the state court trial, Miss Spoon " * * * started shaking and drawing herself up and shaking real bad,"[3] but she did not then identify petitioner as her attacker. When asked by petitioner's counsel in the state court trial why she did not immediately in her room identify petitioner as her assailant, Miss Spoon responded: "Because I had been threatened, my father had been threatened. I don't know legal procedure, I didn't know whether they could hold him or not, and if he happened to break and get loose or something, he would do like he said he would, just get a gun and come back and kill us. I didn't know how long I was going to stay in that hospital."[4] On direct examination, Miss Spoon testified that there was not any possible doubt in her mind that petitioner was her attacker.[5]

■ The conclusion is compelling that petitioner was arrested with reasonable cause and that therefore the arrest without a warrant was lawful under the circumstances. The police were benefited by a description given by Miss Spoon as to the size, complexion and clothes of her assailant. Officer Pettis was undoubtedly familiar with the Negro community. He had seen petitioner that night on the

2. The details of the identification are set out in the transcript of Miss Spoon's testimony taken at the hearing on the habeas corpus proceeding. See also Record, Vol. II, pp. 286–290, Maxwell v. State, 236 Ark. 694, 370 S.W.2d 113 (1963) (hereinafter cited as State Court Record).

3. State Court Record, Vol. II, pp. 312 and 313.

4. State Court Record, Vol. II p. 289.

5. State Court Record, Vol. II pp. 263, 264, and 268.

avenue and his description matched the one given by Miss Spoon. Petitioner, known to the police as "Plunk", had previously experienced difficulties with the police, and petitioner personally knew Officer Pettis. His home was near the place of attack, as well as the victim's home.

(b) *The Search of Petitioner's Person*

It is settled law that a search of the person or premises incident to a lawful arrest is permissible. Preston v. United States, 84 S.Ct. 881 (1964). Ker v. California, supra. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1948). United States v. Iacullo, 226 F.2d 788 (7th Cir. 1955). See also Commonwealth v. Holmes, 344 Mass. 524, 183 N.E.2d 279 (1962), and cases collected in Annot., 89 A.L.R.2d 715, 780–801 (1963). Since the arrest without a warrant was lawful under the circumstances, it follows that the evidence obtained from the clothes removed from petitioner's body and the thread and hair taken from petitioner's head were not illegally obtained. See United States v. Iacullo, supra, 226 F.2d at 792, discussing United States v. Di Re, 332 U. S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948); and Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1958). United States v. Cole, 311 F.2d 500 (7th Cir. 1963), cert. denied 372 U.S. 967, 83 S.Ct. 1092, 10 L.Ed.2d 130 (1963).

The items obtained from petitioner at the Hot Springs City Jail, *i. e.*, a hair from his head, a strand of nylon thread found in his hair, and his clothing, were necessary to a thorough investigation of the offense with which petitioner was charged and the obtaining of these items in the course of the investigation was a reasonable procedure under the circumstances. According to Miss Spoon's report, her attacker had worn a nylon stocking on his head which came off as the attacker attempted to pull it over his face. The police had found a nylon stocking near the victim's house in the vicinity where the attack had occurred. Furthermore, the clothing worn by petitioner had seminal stains, as well as blood stains. These items, along with others, were sent to the Federal Bureau of Investigation laboratories in Washington, D. C., for scientific analysis.

(c) *The Search of Petitioner's Home*

Petitioner argues that the police officers conducted an illegal search and seizure in obtaining a blue coat from his home after petitioner was arrested. The coat was obtained by Captain Crain from petitioner's mother and it was used as evidence in the state court trial. (Certain clothes obtained by Officer Timms from petitioner's mother on a second trip back to the house were merely a convenient change of clothes for the ones obtained from petitioner at the City Jail and were not used as evidence.) Admittedly, the blue coat was obtained without a search warrant.

In the state court trial, Captain Crain testified that he obtained the coat with the permission of petitioner's mother, and this was not disputed at the state court trial despite the fact that petitioner's mother was in the court room and heard this testimony.[6] At the hearing on the instant petition, Captain Crain again testified that he explained to petitioner's mother that he wished to get the clothes worn by petitioner that night and that she took him to petitioner's room and showed him the closet where the coat was hanging. Captain Crain informed petitioner's mother that petitioner had been accused of committing rape. Petitioner's mother, age 40, testified that petitioner lived there with his parents and occupied a room with his two brothers. At the time of the search, petitioner's father was at work and petitioner's two brothers were in bed asleep. Petitioner's mother further stated in substance at the hearing on the instant petition that she did not know anything about a search warrant and did not object to the police coming into her home since she did not think anything was

---

6. State Court Record, Vol. II, pp. 333 and 334.

wrong and there was no reason not to cooperate. On cross-examination, petitioner's mother stated: "I didn't never say that I didn't grant permission."

The evidence not only reflects that petitioner's mother freely and voluntarily consented to the police officer taking the coat, but she also cooperated with the officer to the extent that she showed the officer where the coat was located. The coat was obtained less than an hour after petitioner was arrested. The search itself was not a general exploratory search of the entire house, nor was it a rigorous search. The police officer simply requested to see the clothes which petitioner had worn that night and petitioner's mother permitted the police to enter her house and accompanied the police to petitioner's room and directed them to the closet. The analysis made by the Federal Bureau of Investigation at the laboratory in Washington, D. C., established that the blue-black woolen fibers in the nylon stocking found near Miss Spoon's house, as well as the blue-black fibers found in Miss Spoon's pajamas, came from this coat taken from the closet.[7]

 Of course, petitioner's state court conviction cannot be based upon evidence obtained in violation of the Fourth Amendment to the United States Constitution and contravening the Fourteenth Amendment due process clause. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). However, the protection of the Fourth Amendment prohibits only those searches which are "unreasonable". United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950); and a search and seizure are not deemed to be unreasonable and therefore unlawful if based upon a valid consent freely and understandably given. Foster v. United States, 281 F.2d 310 (8th Cir. 1960). See also United States v. Roberts, 223 F.Supp. 49 (E.D.Ark.1963). Yet, ultimately, the reasonableness of any search depends upon the facts and circumstances of each case.

United States v. Rabinowitz, supra, 339 U.S. at 63, 70 S.Ct. 430, 94 L.Ed. 653.

It would unduly burden this opinion to attempt to analyze the many cases involving consent to a search and seizure of property or evidentiary material. These cases are fully discussed by Chief Judge Henley in United States v. Roberts, supra, 223 F.Supp. at 58 and 59, in which the court observes that there is no hard and fast rule but rather the determination in each case is based upon a consideration of all of the surrounding facts and circumstances, including the validity of the consent. Only recently, the United States Supreme Court in Stoner v. California, 84 S.Ct. 889 (1964) rejected the argument that the search of a hotel room, although conducted without the consent of the accused, was lawful because it was conducted with the consent of the hotel clerk. Similarly, the Supreme Court has refused to permit the unlawful search of a hotel room to rest upon the consent of the hotel proprietor, Lustig v. United States, 338 U.S. 74, 69 S.Ct. 1372, 93 L. Ed. 1819 (1949), or a hotel manager, United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); and a search of a tenant's room with the consent of the owner of the house has been held unconstitutional, Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L. Ed.2d 828 (1961), as well as a search of an occupant's room in a boarding house, McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948). However, all of these cases are distinguishable from the instant case in which petitioner merely shared a room with his two brothers in his parents' home.

In Stoner v. California, supra, the Supreme Court discussed the argument that the search of the defendant's room was justified by the hotel clerk's consent and concluded:

"It is important to bear in mind that it was the petitioner's constitutional right which was at stake here, and not the night clerk's nor

7. State Court Record, Vol. II, p. 359.

the hotel's. It was a right, therefore, which only the petitioner could waive by word or deed, either directly or through an agent. It is true that the night clerk clearly and unambiguously consented to the search. *But there is nothing in the record to indicate that the police had any basis whatsoever to believe that the night clerk had been authorized by the petitioner to permit the police to search the petitioner's room.*" (emphasis added)

■ The evidence adduced at the hearing on this petition, as well as the record from the state court trial, clearly and positively establishes that petitioner's mother freely, voluntarily, intelligently and understandingly consented to and authorized the search made by Captain Crain to obtain the blue coat. The search was made in her home at a time when the premises were under her sole control and she had the right to exclude whomever she chose, even including the petitioner. Petitioner's mother had the authority to permit the police or anyone else to enter petitioner's room and examine the clothes in the closet. In the language of the Supreme Court in Stoner, the police did have a "basis * * * to believe that * * * [petitioner's mother] * * * had been authorized by the petitioner to permit the police to search the petitioner's room." This is true not because of any agency based upon the mother-son relationship, but rather because petitioner's mother, unlike petitioner himself, had the sole control, power and, at the time, the superior right to exclude others from not only her home but also from the very room which petitioner shared with his two brothers, and it was her free and voluntary choice to permit the police to enter and search the closet.

It is the holding of this Court that the blue coat taken by Captain Crain was obtained by a lawful search and seizure, and petitioner's contention to the contrary is rejected. However, the propriety of the search and seizure need not

rest solely upon the consent given by petitioner's mother. The lawfulness of this search and seizure is based upon a consideration of all of the facts and circumstances surrounding the search and seizure which, in the opinion of the Court, establish that from a realistic and practical standpoint there was nothing unfair, unreasonable or oppressive in the conduct of the police in the performance of the search and seizure of the blue coat. The consent given by petitioner's mother, the demeanor and actions of Captain Crain in informing petitioner's mother of exactly what was sought, as well as informing her of the charge against petitioner, the orderly investigation of only the closet in her presence without any protest whatsoever—all of these things taken in the aggregate compel this Court to the conclusion that the police acted fairly and reasonably, and did not violate petitioner's constitutionally protected rights against an unreasonable search and seizure.

(d) *The Alleged Mistreatment and Coerced Confessions*

■ It is true, as now argued, that when petitioner was taken into custody and incarcerated in the City Jail he was not permitted to see his parents or a lawyer. Maximum precautions were taken by the police primarily because the City Jail was a converted military jail which furnished poor security and there had been numerous escapes from this jail in the past. In fact, part of the jail was secured merely by a cyclone fence. Petitioner testified at the hearing on the instant petition that he was mistreated by the police officers and that he was coerced into making a confession in Hot Springs, as well as one in Malvern. This statement that the confessions were coerced was sharply disputed by the testimony of the police officers. Neither confession was used as evidence in the state court trial and all of the evidence there relied on was obtained prior to the time when petitioner allegedly made either of the two confessions. Petitioner's conviction was in no way based upon any

confession or information obtained therefrom. Therefore, any attempt to determine whether the confessions were voluntary is unnecessary.[8]

## II. ADVERSE ATMOSPHERE

 Petitioner relies principally on the testimony of Kenneth Adair to support the contention that the atmosphere which existed in Garland County prior to and during the trial was so hostile and adverse that petitioner did not receive a fair trial. Mr. Adair, a Negro newspaper publisher in the city of Hot Springs who followed petitioner's trial daily and who contributed funds for the bringing of this habeas corpus proceeding, testified that there was a "tense atmosphere and some talk of mob violence." Irving S. Stephenson, a Negro businessman and former Garland County jury commissioner called as a witness by respondent, also testified that there was an "adverse atmosphere". On the other hand, Darfus Henry, a Negro businessman who was one of the jury commissioners for the jury empaneled for the trial of petitioner's case in state court, testified that there was not a hostile atmosphere at the time.

In the state court proceeding, petitioner requested a change of venue on the alleged ground that he could not obtain a fair and impartial trial in Garland County. Accordingly, a hearing was scheduled and Dan Wolf, Mayor of the City of Hot Springs, and Duffie Searcy, the Sheriff of Garland County, were called by petitioner to testify af the hearing, which was held pursuant to Ark. Stat. § 43–1502 (1947). Mayor Wolf, a resident of Hot Springs off and on for about thirty years, stated that he had talked to "both the colored people and the white people" in the area and it was his opinion that petitioner could get a fair and impartial trial in Garland County.[9] Similarly, Sheriff Searcy, a resident of Garland County for fifty-one years, stated that petitioner could get a fair and

impartial trial in Garland County.[10] These were the only witnesses called to testify at the hearing, and the request for a change of venue was denied.

Obviously such a heinous crime as perpetrated against Miss Spoon would arouse some public sentiment. However, the evidence produced at the hearing on this petition falls far short of the contention now urged in this regard. Cf. Moore v. Dempsey, 261 U.S. 86, 43 S. Ct. 265, 67 L.Ed. 543 (1923). On the contrary, the undisputed evidence at the state court hearing established that petitioner could get a fair and impartial trial in Garland County, and the voluminous record of the state court proceeding reflects that petitioner did in fact receive such a trial.

## III. SELECTION OF THE JURY

Petitioner contends that there was racial discrimination practiced in the selection of the jury which was empaneled to try his case in the state court. This argument was not raised at any time in the state court proceeding, notwithstanding the fact that the record in this proceeding discloses the attorney who represented petitioner throughout the state court action, Mr. Chris Mercer, was well aware of the constitutional right against jury discrimination on the basis of race, and checked the jury list, ascertained the identity of the jury commissioners, knew the percentage of Negroes in the area, noticed some repeaters, knew about the racial designations on some of the names, was fully familiar with the practice of quashing jury panels on the ground of racial discrimination, and, in fact, discussed the jury panel with petitioner, and, further, filed several motions directed at other aspects of alleged unconstitutionality of the state court proceeding.

 It would reasonably appear that it was, in the language of Fay v. Noia, 372 U.S. 391, 439, 83 S.Ct. 822, 9 L.Ed.2d

8. Neither of these confessions were introduced into evidence at the hearing on the instant petition.

9. State Court Record, Vol. I, p. 97.

10. State Court Record, Vol. I, p. 102.

837 (1963), the "considered choice" of petitioner deliberately not to raise this argument of jury discrimination, and, therefore, there was a waiver of the right to make this argument now. In Fay v. Noia, supra, 372 U.S. at 438 and 439, 83 S.Ct. 822, 849, 9 L.Ed.2d 837, the United States Supreme Court stated:

"* * * The federal habeas judge may in his discretion deny relief to an applicant who has deliberately by-passed the orderly procedure of the state courts and in so doing has forfeited his state court remedies.

"* * * If a habeas applicant, after consultation with competent counsel or otherwise, understandingly and knowingly forewent the privilege of seeking to vindicate his federal claims in the state courts, *whether for strategic, tactical, or any other reasons that can fairly be described as the deliberate by-passing of state procedures,* then it is open to the federal court on habeas to deny him all relief if the state courts refused to entertain his federal claims on the merits—though of course only after the federal court has satisfied itself, by holding a hearing or by some other means, of the facts bearing upon the applicant's default. (citation omitted) At all events we wish it clearly understood that the standard here put forth depends on the considered choice of the petitioner. * * * " (emphasis added)

However, even assuming *arguendo* that petitioner has not waived the right to present this argument, it is the view of this Court that this argument that there was racial discrimination in the selection of the jury panel in petitioner's state court trial is without merit.

▮▮▮▮ Petitioner's right to a trial by "impartial jury" is guaranteed, Ark. Const. Art. 2, § 10; and discrimination on the basis of race or ancestry in the selection of persons for service on grand or petit jury panels is clearly violative of the equal protection clause of the Fourteenth Amendment to the United States Constitution. Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950). The question of whether or not racial discrimination has been practiced in the selection of a jury panel is a question of fact, and it is the duty of a federal court to make independent inquiry into such alleged discrimination and determine whether a federal right has been denied. Bailey v. Henslee, supra, 287 F. 2d at 943.

In Bailey v. Henslee, supra, Judge Blackmun discussed at length the alleged jury discrimination practiced in Pulaski County Circuit Court, enumerating some nine factors, and, on page 947 of 287 F.2d concluded:

"* * * Here there appears to be a definite pattern of race selection; here there is a device for race identification with its possibility of abuse; here there is exclusion from the alternate panels and from the special panels actually used; here there is an element of recurrence of the same Negro names; and here there is the additional factor, for what atmosphere it may provide, of exclusion from the civil divisions' panels."

It is the position of petitioner that the "racial discrimination in the selection of jurors in Garland County, Arkansas, presents a stronger case than the evidence presented in the Bailey case."

Few, if any, of the items enumerated by Judge Blackmun in Bailey appear in the selection of the jury which tried petitioner in state court. The regular jury panel present for the trial consisted of 27 people, two of whom were Negroes, and the alternate panel present also consisted of 27 people, seven of whom were Negroes. All of these jurors had been selected by three capable jury commissioners: Mr. Jeff Davis Bradley, a lifelong resident of Garland County and grocer in a rural community; Mr. Wayne R. Chitwood, a lifelong resident and local businessman who operated an automobile agency; and Mr. Darfus Henry, a local

Negro businessman who operated a barber shop in the Negro business district of the City of Hot Springs. There had always been at least one Negro jury commissioner for the past few years.

According to the testimony of Mr. Darfus Henry, the Negro Jury Commissioner, the jury panel which served at petitioner's trial, and which was selected for the September 1961 term of the Garland County Court approximately two months before the crime was committed, was selected by each jury commissioner making a list of names of persons who in the judgment of the respective jury commissioner were suitable for jury service.[11] The jury commissioners then checked the lists of names against the poll tax books in order to determine whether or not the prospective jurors were qualified voters.[12] Finally, the lists were checked against a list of jurors who had served within the past two years to make sure that they were not disqualified to serve for that reason.[13] Mr. Henry stated that he selected some of the Negroes on the jury panel and the other commissioners selected some more. This testimony was corroborated by the other two jury commissioners, Mr. Bradley and Mr. Chitwood.

The jury commissioners testified that they did not recall that the poll tax book furnished them had any racial designation of electors, i. e., the letter "c". While they apparently are in error about this fact,[14] it certainly seems that in the procedure used by them in selecting the jury panel it fairly appears that the racial designation did not affect in any way their selection of the jurors who served on the jury panels.

The petit jury list from petitioner's state court trial reflects racial designations by the letter "c" following the names of some, but not all, of the Negroes on the list. The jury commissioners testified that this designation was not

made by them. Mr. Sherlon Hilliard, the Circuit Court Clerk, could not state positively that he had placed the racial designations on the list but he did testify that he often so designated the race of the jurors listed *after the lists were prepared* because he nearly always had requests from the local newspapermen, as well as attorneys, as to the Negro jurors on the panel.

The jury commissioners further testified that they each selected Negroes, along with other prospective jurors, whom they knew and felt would be suitable for jury service, but that they made no special effort to acquaint themselves with other Negroes of Garland County who may have been qualified to serve as jurors. Petitioner points to this fact as evidence of discrimination and cites Cassell v. Texas, supra, wherein Mr. Justice Reed stated at page 289 of 339 U.S., at page 633 of 70 S.Ct., 94 L.Ed. 839. "When the commissioners were appointed * * * it was their duty to familiarize themselves fairly with the qualifications of the eligible jurors * * * *without regard to race and color.* * * *" (emphasis added)

Petitioner would lead this Court to believe that since the jury commissioners did not make a special effort to acquaint themselves with the qualified Negro electors, they did not discharge "their duty to familiarize themselves fairly with the qualifications of eligible jurors." This conclusion is a *non sequitur* since if the jury commissioners had singled out a particular group on the basis of race there clearly would have been a selection of jurors *with* regard to race instead of *without* regard to race. It is the view of this Court that in the selection of the jury empaneled to serve at the trial of petitioner's case, the language of Mr. Justice Reed in Cassell v. Texas, supra, was fulfilled to the letter and the spirit by the jury commissioners, Mr. Bradley,

---

11. Qualifications of jurors are generally set out in Ark.Stat.Ann. § 39–101—39–116 (1947).

12. Ark.Stat.Ann. § 39–101 (1947).

13. Ark.Stat.Ann. § 39–225 (1947).

14. Ark.Stat.Ann. § 3–227(b) (1947) requires the racial designation on the poll tax records.

Mr. Chitwood and Mr. Henry, who each in their varied occupations had a wide acquaintance of Garland County, and by force of their varied occupations were reasonably familiar with the residents of Garland County, both those who were qualified electors and those not qualified; and, the Court is of the opinion that the jury commissioners did in fact select a jury panel "without regard to race or color".

It was clearly stated in Bailey by Judge Blackmun that " \* \* \* Discriminatory selection in prior years does not nullify a present conviction if the selection of the jury for the current term is on a proper basis. 'Former errors cannot invalidate future trials.' [citing Brown v. Allen, 344 U.S. 443, 479, 73 S.Ct. 397, 418, 97 L.Ed. 469 (1953)]" Bailey v. Henslee, supra 284 F.2d at 943. However, in order to avail petitioner of every reasonable opportunity to establish the alleged jury discrimination, petitioner was permitted to introduce into evidence at the hearing on the instant petition copies of the jury records of Garland County, Arkansas, for the past 28 consecutive terms of the Garland County Circuit Court, dating from the March 1949 term to the September 1963 term. It would unduly burden this opinion to attempt to discuss in detail these records. It is the view of this Court that the exhibits summarizing these records do not establish the racial discrimination in the selection of the jury, as petitioner now argues.

 The figures compiled by petitioner, and quoted in his brief on page seven, indicate that almost 14% of the persons who served on the regular petit jury panels from March 1949 to September 1963 in the Garland County Circuit Court were Negroes. However, this figure is based on the number of Negroes so designated by race, and it is undisputed that not all Negro jurors were designated by race. Hence, even the figure of 14% represents slightly less than the actual percentage of Negroes participating in jury service. Unlike many counties in Eastern Arkansas, Garland County is not heavily populated by Negroes. Petitioner established by the testimony of Mr. Floyd Bryan, an accountant in the Auditor's Office of the State of Arkansas, that the percentage of qualified Negro electors residing in Garland County has numbered from 10% to 11% over the years.

 Admittedly, proportional representation of races on a jury is not a constitutional requisite, Cassell v. Texas, supra at 286 of 339 U.S., 70 S.Ct. 629, 94 L.Ed. 839 and a disproportion in the number selected does not even establish racial discrimination in the selection of a jury. Bailey v. Henslee, supra, 287 F.2d at 942, citing Akins v. Texas, 325 U.S. 398, 403, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945). Now, petitioner in support of his argument of jury discrimination urges this Court to consider statistics which reflect the proportionate number of Negroes available for jury service in comparison with the proportionate number of Negroes who actually served as jurors, i. e., 10%–11% :14%. In short, a far greater proportion of qualified Negroes have served as jurors in Garland County for the past 28 consecutive terms of court than actually, in fact, reside there. Obviously, it does not follow from these statistics that Negroes have been racially discriminated against in the selection of jurors during this period.

Petitioner further argues that from these records covering 28 consecutive terms of court, there is a recurrence of Negroes on the juries, and this evidence of "repeaters" establishes a pattern of limiting the participation of Negro electors for jury duty. Undoubtedly, over a period of 28 consecutive terms there might be a recurrence of some individuals serving as jurors, particularly in a county no larger than Garland County.[15] The fact that Mr. Darfus Henry, as well

15. According to the statistics furnished by Mr. Floyd Bryan, an accountant employed in the State Auditor's office, the total number of qualified electors in Garland County was slightly less than 20,000 for each of the years 1957 and 1959.

as Mr. Emmett Harris, served as a juror for three terms over this period of approximately fourteen years, and further that some Negroes from the same immediate family were called during the same term do not establish, as petitioner contends, any pattern of limiting the Negro participation in jury service. Petitioner has failed to furnish an accurate picture of the existence of repeaters generally, assuming there are others, as compared to Negro repeaters; and hence the significance, if any, of petitioner's statistics cannot be fairly determined. The proof falls far short of establishing what petitioner now argues in this regard.

## IV. ALLEGED UNCONSTITUTIONALITY OF THE ARKANSAS RAPE STATUTE

■ Petitioner argues the unconstitutionality of the statute under which he was convicted. This statute, Ark. Stat. § 41–3403 (1947), provides in substance that any person convicted of rape shall suffer the punishment of death or life imprisonment. It is petitioner's contention that this statute has been so applied in Arkansas that Negro men who are convicted of rape upon white women "usually" receive the death sentence, whereas white men and Negro men who commit rape upon Negro women "usually" receive a lesser sentence than death. Thus, petitioner contends that Negro men are denied equal protection of the law, and cites Pace v. Alabama, 106 U.S. 583, 1 S.Ct. 637, 27 L.Ed. 207 (1882), and People v. Friedman, 341 U.S. 907, 71 S.Ct. 623, 95 L. Ed. 1345 (1951), both of which were discussed briefly by the Arkansas Supreme Court when this argument was made on appeal and decided adversely to petitioner. Maxwell v. State, supra, 236 Ark. at 701 and 702, 370 S.W.2d at 117 and 118.

In the state court proceeding, prior to the trial, a hearing was held on petitioner's motion to declare Ark.Stat. § 41–3403 (1947) unconstitutional in its application. In support of its motion, petitioner relied on the Arkansas State Penitentiary records of criminal executions from September 5, 1913 through October 28, 1960.[16] At the hearing held on the instant petition, petitioner was also permitted to introduce evidence from the Circuit Clerks, the Prosecuting Attorneys, and the Sheriffs of Garland, Jefferson, and Pulaski County, Arkansas, as to the number of rape prosecutions in these counties and the disposition of these prosecutions for the period of January 1, 1954, through January 1, 1964. Petitioner now relies on all of this evidence to establish the unconstitutionality of this statute, as alleged.

It would serve no useful purpose to discuss the exhaustive statistics compiled by petitioner regarding the rape prosecutions as shown by the records examined of the three counties. While the court records are complete, the information obtained from the prosecuting attorney's office and from the sheriff's office of these counties is not, due to the fact that such records for an extended period of time have not been preserved in these offices. However, considering all of the documentary evidence introduced by petitioner, as well as the testimony offered, and giving the petitioner every favorable inference reasonable from this evidence, it is the view of this Court that petitioner has failed to establish the unconstitutional application of Ark.Stat. § 41–3403 (1947).

■ Assuming that it is true, as petitioner contends, that Negro men in these three counties for the period in question who were convicted for raping a white woman were sentenced to death, whereas white men and Negro men who allegedly raped Negro women were either not charged or given a lesser charge than rape, the fact remains that the choice of punishment in a capital case is within the province of the jury, Ark.Stat. Ann. § 43–2153 (1947). It is a matter of common knowledge that the legal de-

16. These statistics are detailed in the record and discussed fully by the Arkansas Supreme Court in Maxwell v. State, 236. Ark. 694, 701, 370 S.W.2d 113 (1963).

'fense of consent is always an obstacle to a rape prosecution and the moral character of the prosecuting witness is almost always in issue. The statistics compiled by petitioner represent a rather naive attempt to ascertain why a rape conviction was sought in one case and yet not in another. Petitioner apparently does not now contend that jury verdicts in rape prosecutions are based on racial discrimination, and there is certainly no evidence in the record to warrant this conclusion. On the contrary, each of the prosecuting attorneys called as a witness by petitioner stated under oath that they have prosecuted all cases, including charges of rape, without regard to race.

It is the view of this court that petitioner has failed to establish that Ark. Stat. § 41–3403 (1947) is unconstitutional in its application, as alleged. Ironically enough, petitioner and one Charles Franklin Fields, a white man whose conviction for the crime of rape under this statute was affirmed by the Arkansas Supreme Court in Fields v. State, 235 Ark. 986, 363 S.W.2d 905 (1963), were both scheduled to be executed at the Arkansas State Penitentiary on January 24, 1964. Fields was executed on that day.

■ Finally, petitioner has contended that the imposition of the death penalty on a charge of rape contravenes the Eighth and Fourteenth Amendments to the United States Constitution for the reason that such a penalty conflicts with the basic concepts of fairness and right to civilized societies. Petitioner relies solely on the dissenting opinion in the denial of certiorari by the United States Supreme Court in Rudolph v. Alabama, 275 Ala. 115, 152 So.2d 662 (1963), cert. denied 375 U.S. 889, 84 S.Ct. 155, 11 L. Ed.2d 119 (1963). Suffice it to say that the alleged unconstitutionality, on the theory advanced, must rest upon the pronouncement of the majority and not the dissent.

The petition will be denied.