MAXWELL v. STATE.

5057                                           370 S. W. 2d 113

Opinion delivered May 27, 1963.

[Rehearing denied September 9, 1963.]

*Christopher C. Mercer, Jr.* and *Delector Tiller,* for appellant.

*Bruce Bennett,* Atty. General, by *Jack L. Lessenberry,* Asst. Atty. Gen., for appellee.

OSRO COBB, Special Associate Justice. 1. This is a criminal case wherein appellant was charged, under Ark. Stat. Ann. 1947, Sec. 41-3401, with the commission of the offense of rape. Prior to 1915 conviction for this offense carried a mandatory death penalty. By Act No. 187 of 1915 (Ark. Stat. Ann. 1947, Sec. 43-2153) the mandatory death penalty was removed as to all capital offenses and the jury trying the accused was authorized to bring in a verdict of guilty and life imprisonment in the State penitentiary in lieu of the death penalty, if it so desired.

2. At the conclusion of this trial the court provided the jury with three forms of verdicts, as follows: (1) Not guilty; (2) Guilty with life imprisonment; (3) Guilty as charged. After several hours of deliberation the jury returned verdict No. 3, making the death sentence mandatory. Such a sentence was pronounced upon the appellant on April 5, 1962. Execution of appellant has been stayed pending review of the case here on appeal.

3. We have painstakingly examined the entire record. We have considered on its merits every motion made on behalf of appellant and denied by the trial court and we have considered on its merits every objection interposed by counsel for appellant to which adverse rulings were made by the court. In capital cases the formal saving of exceptions to adverse rulings in unnecessary. Ark. Stat. Ann. 1947, Sec. 43-2723.

## I. SUFFICIENCY OF THE EVIDENCE

The offense involved was committed on November 3, 1961. Within a matter of hours appellant was taken into custody. State and Federal authorities collaborated in a thorough investigation of the crime and on November 7, 1961, appellant was formally charged by the filing

of a criminal information. Appellant makes no complaint as to the circumstances of his arrest or as to the promptness of the State's attorney in filing the information against him.

Miss Stella Spoon, age 35, lived with her aged and helpless father at 108 Nichols Street in the city of Hot Springs, in Garland County. Near 3:00 a. m. on November 3, 1961, she was aroused by an unusual noise. Clad only in her pajamas, she went into the living room. She saw the form of a man at the window engaged in cutting or breaking the screen. She warned the intruder to leave or she would call the police. The man kept trying to force the screen and she ran to her telephone in the same room to call the police. Almost in the same instant the man burst through the window. Miss Spoon had dialed the operator before she was violently seized and the receiver knocked from her hand. The telephone operator, hearing the screams, connected the line to police headquarters, where an officer heard the screams and the struggle, traced the call, and dispatched officers to the scene.

Once inside the home, the intruder subjected Miss Spoon to a literal nightmare of brutality and abuse. She fought and struggled, but to no avail. She struck the intruder with a purse. When he forced his hand over her mouth to silence her screams she bit his finger, causing it to bleed. Her helpless father tried to aid her, but was struck and left bleeding. She tried to escape through the front door, but was caught. Her attacker kept threatening to kill her and her father as well. She was dragged and forced outside the house without shoes, and while clad only in her pajamas was forced to a remote spot some two blocks from her home, where battered, bruised, bleeding and exhausted she was overpowered and compelled against her will to suffer a deliberate and calculated rape of her person. After the ravage of her person had been accomplished, and before fleeing, her attacker threatened to kill her and her father if she told.

Testimony establishing the identity of appellant as the attacker is clear and emphatic. At the window he

had a part of a nylon stocking on his head, with a knot in it. When he appeared to try to quickly jerk it down over his face it came off. A piece of nylon hose was found near the home of the victim and the FBI Laboratory at Washington, D. C., found in said nylon hose specimens of hair similar in every detail to that of appellant. A thread of nylon combed from appellant's head was found to be exact in all details with the threads of the hose found near victim's house. Negroid hair found in the home of the victim corresponded exactly with hair of appellant.

Officers working on the case were quick to note the fresh injury to appellant's finger and the condition of the clothes he was then wearing. Officers were dispatched to his mother's home, where appellant resided, and she was advised that her son was in trouble. They asked permission to examine his clothes and his mother consented thereto, taking the officers to the clothes closet and permitting them to take a change of clothes and also a blue coat and a trench coat belonging to appellant. The officers forwarded to the FBI Lab in Washington, D. C., the clothing removed from the person of the appellant, his blue suit coat, his trench coat; the victim's pajamas and the strands of hair, nylon thread and hose previously mentioned. The repeated and violent contact between the pajamas worn by the victim and the clothing of appellant left their telltale marks on both garments.

Robert Duckett, Special Agent, FBI Laboratory, whose qualifications were admitted as an expert on hairs, fibers, textiles and related materials, testified: "It has been my experience that when clothing comes in contact with other clothing or objects fibers will be interchanged or deposited. Now working on this assumption, I removed the foreign debris adhering to the T shirt that was submitted to me, the suit that was submitted to me, and the trench cost that was submited to me ... I mounted the foreign fibers and I compared those foreign fibers that I had recovered from the debris from the garments with the fibers composing the red pajamas. In the debris of the T shirt, in the debris of the suit coat and in the debris of the trench coat, I found red cotton fibers that

matched the fibers composing the pajamas ... '' He also testified in detail as to the matching hair and nylon thread and hose specimens examined as set out above.

Allison Simms, Special Agent, FBI Laboratory, whose qualifications as an expert in analysis of blood stains and body fluids were admitted, testified: ''I was examining these articles for the purpose of blood stains and seminal stains. Seminal stains are stains which consist of semen and semen is the male reproductive fluid which contains the male reproductive cell. I examined the pajama bottoms and tested these stains chemically and determined that these reddish brown stains consisted of blood—human blood. In the crotch of the pajamas I identified seminal stains—also on the front portion of both legs of the trousers I identified seminal stains which contained spermatozoa. On the shirt I did not find any semen but there were blood stains present which were human blood ... ''

Miss Spoon struggled with her unmasked attacker in the light of her living room and having never seen him before made a special effort to remember his face. She testified:

''Q. Is that the man? (indicating appellant, then standing to be observed by the witness)

''A. Yes, sir, it is.

''Q. Is there any possible doubt in your mind?

''A. No, sir.''

Dr. James H. French (professional qualifications admitted by appellant) examined the victim shortly after the crime in the emergency room of a Hot Springs hospital. He testified: ''This patient had numerous bruises, cuts about her person. She had the undersurface of her left toe torn, the greater part of the skin was torn. She had a bruise on her right hip, both wrists had abrasions circling the wrist, she had bruises of both forearms, she had a bruise and swelling of the lower lip, she appeared emotionally upset. I did an internal examination and obtained a smear from the mouth of the womb and found

living spermatozoa of the male germ cells in the secretion.''

The evidence in this case met in overwhelming fashion all of the requirements for conviction for the offense of rape (Ark. Stat. Ann. 1947, Sec. 41-3402). *McDonald* v. *State,* 225 Ark. 38, 279 S. W. 2d 44.

## II. MOTION TO QUASH INFORMATION

This criminal information was filed under authority of Amendment No. 21 to the Constitution of Arkansas. Appellant requested and was granted additional time by the court in which to enter his plea to the charge. A bill of particulars was provided appellant and his counsel, no objection being interposed thereto. After arraignment and plea of not guilty appellant requested and was given additional time in which to prepare his defense. When appellant was finally placed upon trial he and his counsel knew with particularity the exact nature of the charge. Counsel for appellant and appellant were present in open court on February 5, 1962, when the motion for continuance was granted and an agreed trial date of the case, beginning on March 19, 1962, was set. No additional time was requested for preparation for trial. Hearings on preliminary motions were ended on March 16, 1962, and the court at that time asked counsel for appellant if there was any reason why the trial could not commence on March 19, 1962, as set, and was advised ''The defense will be ready.'' The rights of the accused were fully protected. This Court and the Supreme Court of the United States have many times held such prosecutions by information valid. *Washington* v. *State,* 213 Ark. 218, 210 S. W. 2d 307; *Moore* v. *State,* 229 Ark. 335, 315 S. W. 2d 907, *cert. denied,* 358 U. S. 946; *Hurtado* v. *Cal.,* 110 U. S. 516; *Gaines* v. *Washington,* 277 U. S. 81; *Adamson* v. *California,* 332 U. S. 46. Denial of the motion of appellant to quash was proper.

## III. MOTION TO DECLARE STATUTE UNCONSTITUTIONAL IN APPLICATION.

In this motion appellant concedes that our penalty statute for rape (Ark. Stat. Ann. 1947, Sec. 41-3403) is

not unconstitutional on its face, but contends that in its application to appellant and all other members of the Negro race it is unconstitutional for the reason that in Arkansas it is the practice and custom of juries to impose the death penalty upon Negro men who rape white women, without inflicting the same punishment upon other offenders. The court heard evidence on the motion. Lee Henslee, Superintendent, Arkansas State Penitentiary, testified, on call by appellant, that between the dates of September 5, 1913, and October 28, 1960, the records of the penitentiary reflected that there had been 168 executions, broken down by charge and race as follows:

| Negro for rape | 19 | Negro for murder | 108 |
|---|---|---|---|
| White for rape | 1 | White for murder | 38 |
| | | Indian for murder | 2 |

This bare listing of the number of executions does not pretend to cover the total number of such offenses by race or otherwise, nor does it cover trials resulting in acquittals, imposition of life sentences, or cover the intervention of executive clemency.[1] Certainly there was no evidence offered even remotely suggesting that the ratio of violent crimes by Negroes and Whites was different from the ratio of the executions. There was no testimony suggesting that the State's attorneys in the various judicial districts had not been asking for the death penalty in their prosecutions for rape, whether the accused be black or white. In any event, the jury alone could determine the death penalty. The attack therefore appears to be directed against trial by jury.

We have carefully reviewed the decisions of the Supreme Court of the United States cited by appellant in support of his position. We comment briefly as to same. *Pace* v. *Alabama,* 106 U. S. 583. Here an Alabama statute was upheld as not in conflict with the Constitution of the

---

[1] Most of the opinions of this Court do not identify the race of the defendant, and it is impossible to obtain accurate information without reviewing the transcripts, which may or may not reflect the race of the accused. Appellant has listed only one execution of a white man for rape (which happened a few years ago), and this Court, only a few months ago, affirmed the conviction of another white man, with death penalty, on this charge. See *Fields* v. *State,* 235 Ark. 986, 363 S. W. 2d 905.

United States, although it prescribed penalties more severe for adultery between persons of different races than for members of the same race. And in *Friedman* v. *People,* 341 U. S. 90, the case was dismissed upon motion for want of a substantial Federal question. *Yick Wo* v. *Hopkins,* 118 U. S. 356. In this case it was admitted that discrimination was being practiced against certain persons (Chinese) in denying them permits to operate laundries, although possessed of all qualifications set forth in the city ordinance under review. *Smith* v. *Texas,* 311 U. S. 128, is one of several cases involving discrimination as to race in jury service. *Lane* v. *Wilson,* 307 U. S. 268, involved abuses in voter registration. *Chambers* v. *Florida,* 309 U. S. 227, is a criminal case where the conviction was reversed because of long days of confinement and mistreatment before the filing of charges and where confessions were obtained by coercion.

We fail to find any support in the above cases for appellant's position. Striking down our criminal statutes as to a large segment of the population upon the tenuous grounds urged by appellant is illogical. It could only result in chaos in the difficult job of law enforcement for the protection of the people. This Court concurs emphatically with other appellate courts of the United States in holding that justice should be administered equally and fairly as to all citizens regardless of race or color. Our penal statute for rape applies equally to all citizens of all races. On the record before us we find no basis whatever to declare our penal statute for rape unconstitutional in any respect of verbage or application. Appellant's motion was properly overruled.

## IV. MOTION FOR CHANGE OF VENUE

The burden was on appellant (Ark. Stat. Ann. 1947, Sec. 43-1502) to make credible proof to support his motion. A hearing was had. All of the witnesses called by counsel for appellant testified squarely against his position. Incidentally, we note here that in appellant's listing of executions for rape that not a single such case appears to have originated from Garland County, where this case was tried. There was no abuse of discretion by the

trial court in overruling the motion for change of venue. *Speer* v. *State,* 130 Ark. 457, 198 S. W. 113; *Adams* v. *State,* 179 Ark. 1047, 20 S. W. 2d 130.

## V. MOTION TO REMOVE TO FEDERAL COURT

Ordinarily such motions are filed directly in Federal Court. No cause was shown justifying such removal, and the trial court properly refused to surrender its jurisdiction. *Rand* v. *State,* 191 F. Supp. 20 (D. C., Ark., 1961).

## VI. OBJECTIONS RELATING TO VOIR DIRE

The trial court had the advantage of observing and appraising the demeanor and answers of all prospective jurors. He allowed appellant's counsel the greatest latitude in examining the jurors before they were approved by the court for duty in the case. Indeed, we think the court proceeded in an exemplary manner in securing a jury free from actual or implied bias or prejudice. The objections of appellant concerning the selection of the jury were properly overruled. *Polk* v. *State,* 45 Ark. 165; *Maroney* v. *State,* 177 Ark. 355, 6 S. W. 2d 299; 50 C. J. S., "Juries, Sec. 275 a(1)."

## VII. OBJECTIONS AS TO LIMITATIONS OF EXAMINATION OF WITNESSES

We find from the record that the court conducted the trial of this case in such a manner as to provide counsel for appellant every reasonable and legitimate latitude in cross-examination of witnesses—no witnesses having been put on by appellant. All objections of this character are found to be without merit and properly overruled.

## VIII. APPELLANT'S VARIOUS MOTIONS TO EXCLUDE ALL EVIDENCE ADDUCED BY PROSECUTION CONCERNING ITEMS OF CLOTHING AND OTHER MATERIALS EXAMINED AT FBI LABORATORY, WASHINGTON, D.C.

When the police authorities sent in for examination the clothing of appellant, the pajamas of the victim, and

the other items, as previously mentioned, such action could have helped to exonerate appellant rather than help to convict him, depending upon the findings at the laboratory. In this case the findings pinpointed the guilt of appellant.

The clothing removed from the person of appellant as an incident of his arrest for the crime under investigation was properly obtained. *Jones* v. *U. S.*, 357 U. S. 493; *Drayton* v. *U. S.*, 205 F. 2d 35.

As to items taken from the home of appellant's mother, with whom appellant resided, the evidence clearly shows that the mother not only consented to the search, but assisted the officers in same. She was present at the trial but did not testify. Neither was a motion filed to quash the evidence obtained at the home. The proof by the State met the burden upon the State in proceeding as it did without a search warrant. *Rigby* v. *U. S.*, 247 F. 2d 584; *Cantrell* v. *U. S.*, 15 F. 2d 953, *cert. denied*, 273 U. S. 768.

"The consent of householder to the search of the house dispenses with the necessity of a search warrant, where his mother, with whom defendant was living, consented to the search, though defendant objected to the search of his room." *Gray* v. *Commonwealth*, 249 S. W. 769 (Ky.).

The right to object to evidence on ground of illegal seizure is waived unless there is a timely motion to suppress the evidence. *Morton* v. *U. S.*, 147 F. 2d 28; *Butler* v. *U. S.*, 153 F. 2d 993, *cert. denied*, 324 U. S. 875. No motion to suppress was filed as to any item sent to the FBI Laboratory.

Lieutenant Crain was examined and cross-examined concerning a blue coat obtained at the home, without any objection being made as to the admissibility of such evidence. The admissibility of said evidence was waived. *Sandusky* v. *Warren*, 177 Ark. 271, 6 S. W. 2d 15.

The objections stated by counsel for appellant to the items sent to the FBI Lab were always made in blanket or in all inclusive form, with no breakdown as to any

given item. Such objections are of no avail where any one of several items covered in the blanket objection was lawfully and properly obtained. *Eureka Oil Co.* v. *Mooney,* 173 Ark. 335, 292 S. W. 681; *Haney* v. *Caldwell,* 35 Ark. 156; *Martin* v. *Monger,* 112 Ark. 394, 166 S. W. 566.

Appellant, in his various motions to strike all evidence introduced concerning the articles sent to the FBI Laboratory, has relied almost exclusively upon *Mapp* v. *Ohio,* 367 *U. S.* 643, leading case in which judicial developments as to search and seizure were reviewed comprehensively. In the *Mapp* case, Dollree Mapp was within her own home. Officers appeared and demanded admittance. She refused because they did not produce a search warrant. After some three hours, and without a search warrant, the officers forcibly entered the home, searching for and obtaining evidence in the form of lewd photographs, subsequently used in evidence. There is no similarity of facts in the instant case with the *Mapp* case, *supra,* and action of the Supreme Court of the United States in reversing *Mapp* v. *Ohio, supra,* is inapplicable here.

The items in question, examined by the FBI Lab, were in court during trial, in their original containers from the FBI. They were described in detail in oral testimony of witnesses who had been in custody of or had examined same at the laboratory. The items were not passed to the jury for personal inspection nor were they listed as formal exhibits to the oral testimony adduced concerning same. The direct examination of FBI Special Agent Duckett; his cross-examination and the direct examination of FBI Special Agent Simms had been completed before any objection was made seeking to strike all of their testimony. Counsel for appellant in making an objection told the court that the articles themselves had been introduced in evidence, although improperly. The crux of the evidence as to the items given laboratory examination was the findings as to the stains, body fluids, similarity of hairs, nylon thread, etc. This evidence was susceptible, absent a stipulation of counsel, to introduction solely in oral form. Even if it had been

possible to conduct the laboratory tests in the presence of the jury, such testing would have been worthless as evidence without oral testimony explaining the results and findings.

Physical objects explained to the jury may be used in presenting evidence without formal introduction. *Meyer v. State*, 218 Ark. 440, 236 S. W. 2d 996; *Gordy v. State*, 264 S. W. 2d 103 (Texas); Underhill Criminal Evidence, 5th Ed., Sec. 110.

In *Featherston v. Jackson*, 183 Ark. 373, 36 S. W. 2d 405, this Court said: "On the trial a rough sketch or map showing tracks or ruts in highway was used by appellee in examining his witnesses. Appellant objected to use of said map. It was not introduced in evidence, but the day after the trial was over he filed a motion to require appellee to file the map. This came too late and the Court correctly denied the motion."

At no time in this case did appellant ask for the formal introduction into evidence of the items examined by the FBI Laboratory.

We therefore conclude that the trial court did not commit error in refusing to strike the testimony of the special agents of the FBI. All other motions of appellant to strike testimony were likewise properly denied.

## IX. INSTRUCTIONS

Appellant complains that certain instructions requested by him were not given. An examination of the record discloses that the subject matter of such requested instructions was fully covered in other instructions given by the court. We have consistently held that it is not error to refuse an instruction where the matters are fully covered by instructions already given. *Griffin v. State*, 210 Ark. 388, 196 S. W. 2d 484.

## X. ARGUMENT OF COUNSEL

Appellant objected to the following remarks of the prosecuting attorney during argument:

". . . He could have choked her to death as easily as not . . . He could have had a knife in his pocket and

pulled it out and she did tell you, I believe, that he had some instrument when he was breaking in the screen. He could have pulled a knife out of his pocket and cut her throat from ear to ear.

THE COURT: He is referring to why she was in fear of her life. Your motion is overruled.''

Once inside the home of the victim appellant had access to all the kitchen knives and other possible weapons therein. He repeatedly threatened to kill both the victim and her father. Under the proof in the case we see no impropriety in the ruling of the court.

In his opening statement counsel for appellant stated:

''It is the position of the Defense, and the Defense will prove, both by cross-examination of the witnesses that the State will call and by evidence that it will produce itself that this alleged crime as described by Mr. Whittington could not, and in fact did not take place as he stated . . . That if in fact an assault did take place that certainly it was not rape, that if any assault did take place it was free and voluntary on her part. I think you will find that the evidence as adduced here in the Court, both the evidence produced by the prosecution and by the evidence adduced by the defendant that if in fact an assault did take place it was a free and voluntary act . . . ''

An objection was made during closing argument of prosecution and is set out as follows:

''MR. WHITTINGTON: May it please the Court, ladies and gentlemen, when the counsel for the defense made his opening statement he told you that he would prove to you that this matter did not take place as I had told you in my opening statement, that it was a free and voluntary act, and he would prove that it was a free and voluntary act on the part of Stella Spoon. Now, ladies and gentlemen—

''THE COURT: One moment, Mr. Whittington, Mr. Mercer wants to interpose an objection.

''(Out of hearing of the Jury)

"MR. MERCER: Court please, I object to the prosecuting attorney in his argument to the Jury talking about anything the defendant has to prove because the defendant doesn't have to prove anything.

"THE COURT: Well, he is repeating what you said in your opening statement. I think he has a right to refer to it and comment on it.

"MR. MERCER: Court please, it is not incumbent upon the defendant to prove anything.

"THE COURT: I understand.

"(MR. WHITTINGTON CONTINUES ARGUMENT:)

"Now, ladies and gentlemen, while it is not incumbent upon the defendant to prove anything, the defendant's attorney got up here and he told you they were going to prove some things. They don't have to prove anything, I am the one that has to prove the case, let's get that clear. The Court so instructed you. But he told you what all he was going to prove and I am still waiting to hear any of that proof. I haven't heard a word of it. We have people who must have known where the defendant was that night, if he wasn't where he was supposed to be, I haven't heard any of them say he wasn't there . . . "

Remarks of the prosecuting attorney were well within proper limits, and we find no eror in same. *Ark. P. & L. Co.* v. *Hoover,* 182 Ark. 1065, 34 S. W. 2d 464; *Cubreath* v. *State,* 96 Ark. 177, 131 S. W. 676.

## XI. SUMMARY

The verdict reached and the sentence imposed do not appear to offend the Constitutions of the State of Arkansas or of the United States; the statutes of Arkansas and decisions heretofore rendered by this Court. Appellant received a fair and impartial trial in every respect.

Judgment is affirmed.

HOLT, J., disqualified and not participating.