**William L. MAXWELL, Petitioner,**

v.

**O. E. BISHOP, Superintendent of the Arkansas State Penitentiary, Respondent.**

**No. PB–66–C–52.**

United States District Court
E. D. Arkansas,
Pine Bluff Division.

Aug. 26, 1966.

Norman C. Amaker, of the NAACP Legal Defense and Educational Fund, Inc., New York City, and George Howard, Jr., Pine Bluff, Ark., for petitioner.

Bruce Bennett, Atty. Gen., State of Arkansas, and Fletcher Jackson, Asst. Atty. Gen., Little Rock, Ark., for respondent.

## MEMORANDUM OPINION

HENLEY, Chief Judge.

This is a habeas corpus proceeding wherein petitioner, William L. Maxwell, attacks collaterally for the second time his 1962 conviction in the Circuit Court of Garland County, Arkansas, of the crime of forcible rape. The sentence imposed upon him was death. Ark.Stats. Ann., § 41–3403.

Petitioner, a Negro man, was charged with raping a 35 year old, unmarried

white woman on the night of November 3, 1961. He pleaded not guilty and was tried before a jury. During the trial and during subsequent proceedings in the State court petitioner was represented by capable counsel of his own choice. Following the pronouncement of sentence and entry of judgment by the Circuit Court, petitioner appealed to the Supreme Court of Arkansas where his conviction was affirmed. Maxwell v. State, 236 Ark. 694, 370 S.W.2d 113.

Subsequently, in early 1964 shortly before his scheduled execution petitioner filed in this Court a petition for habeas corpus challenging his conviction and sentence on a number of federal constitutional grounds. The case was assigned to District Judge Gordon E. Young who held a full evidentiary hearing and filed a detailed memorandum opinion denying the petition. Maxwell v. Stephens, E.D. Ark., 229 F.Supp. 205. The Court of Appeals, one judge dissenting, affirmed. Maxwell v. Stephens, 8 Cir., 348 F.2d 325. In late 1965 the Supreme Court of the United States denied certiorari. Maxwell v. Stephens, 382 U.S. 944, 86 S.Ct. 387, 15 L.Ed.2d 353.

In due course the Governor of Arkansas scheduled the execution of petitioner for late July 1966; however, the execution was stayed administratively until September 2. That stay is still in effect.

Instant petition was filed on July 21, 1966. On August 5 a pre-trial conference was held, and the case was set for hearing on the merits on August 22. That hearing has been held as scheduled. The Court has given careful consideration to the materials before it, including oral testimony and documentary evidence. This opinion incorporates the Court's findings of fact and conclusions of law.

In the petition now before the Court petitioner alleges certain things that he alleged in his initial habeas corpus action; some things that were alleged in that action are not alleged here; [1] and the present petition contains some allegations that did not appear in the original proceeding.

Petitioner now contends that racial discrimination was practiced in the selection of the petit jury which tried and convicted him;* that it is unconstitutional to put anyone to death for the crime of rape;* that certain Arkansas statutes to be mentioned dealing with the crime of rape and the punishment to be imposed therefor have been applied unconstitutionally to Negro men convicted of raping white women;* that certain Arkansas statutes dealing with the imposition of the death penalty and certain Arkansas trial procedures in capital cases amount to a denial of due process of law; that petitioner was mentally incompetent to stand trial in the State court, and that his mental condition is now such that it would be unconstitutional to put him to death.[2]

In his pleadings respondent denies that any of petitioner's contentions have merit and, in addition, pleads res judicata, that is to say, respondent asserts that all contentions made here were either raised or could have been raised in the original proceeding in this Court and should not now be considered.

As far as respondent's plea of res judicata is concerned, it is settled

---

1. Contentions made in the original proceeding and not urged here are: that petitioner was the victim of an unlawful arrest; that there was an unlawful search of petitioner's person and home; that evidentiary material was unlawfully seized in the course of the searches; that petitioner was mistreated physically and that a confession was extorted from him; that petitioner was tried in a hostile atmosphere. All of those contentions were considered and rejected by Judge Young; not all of them were urged on appeal; those that were were rejected by a majority of the Court of Appeals. This Court considers that all of the contentions not brought forward into this proceeding have been abandoned or that their lack of merit has been established in the original collateral attack on the State court judgment.

2. The asterisks appearing in text indicate that the contention marked by the asterisk was raised in the original habeas corpus case.

that the conventional rule that issues which were litigated or which could have been litigated in an original proceeding will not be again examined in a subsequent proceeding between the same parties or their privies does not apply with strictness to habeas corpus proceedings in the federal courts. Whether a federal court will entertain a successive application for a writ of habeas corpus, and whether and to what extent such a court will consider in connection with a successive petition matters which were or could have been determined in the original proceeding are questions addressed to the sound discretion of the court. See 28 U.S.C.A. § 2244; Sanders v. United States, 373 U.S. 1, 83 S.Ct. 1068, 10 L. Ed.2d 148; Simcox v. Harris, 8 Cir., 324 F.2d 376, 377. Of course, the fact that a specific contention brought forward in a successive application has been considered and rejected in connection with an earlier application is a factor to be considered by the court to which the successive application is addressed.

In this connection the Court in its pre-trial conference order in this case cautioned counsel for petitioner that if they knew of any constitutional grounds for attack on his conviction which had not been raised, such grounds should be brought forward in this proceeding since the Court "would be most reluctant to consider in some subsequent proceeding any grounds of attack which could have been raised in this proceeding." No contentions other than those previously mentioned have been made.

Taking up first the attack on the make-up of the jury, petitioner's complaint is that the Garland County jury commissioners chose the members of the jury panel from the tax records identifying poll tax payers by race. That is the same complaint about the jury which was made in the original habeas corpus case, and the record here is the same as the one before the Court in that case. The matter was considered thoroughly by Judge Young and by the Court of Appeals and, as indicated, the argument was rejected. This Court sees no occasion to reexamine

the question and is not persuaded to do so by the action of the Supreme Court in recently granting certiorari in the case of Sims v. Georgia, 384 U.S. 998, 86 S.Ct. 1953, 16 L.Ed.2d 1013 noted in 34 U.S. Law Week. 3429.

The Court finds it convenient to consider next the contentions with respect to the mental condition of petitioner.

■ As to the mental condition of petitioner at this time, it was agreed following the pre-trial conference that petitioner would be examined by the staff of the Arkansas State Hospital for Nervous Diseases. The examination was made and petitioner was found to be without psychosis. He thus, in effect, had the benefit of the post-conviction examination contemplated by Ark.Stats. Ann., § 43–2622. In addition, at the request of counsel for petitioner he was examined by Dr. William G. Rees, Professor of Psychiatry and head of the Department of Psychiatry at the University of Arkansas Medical Center. Dr. Rees also found petitioner to be without psychosis. Petitioner was present at the hearing and was observed by the Court; the Court noted no irrationality in petitioner's behavior, and petitioner gave no evidence of present mental incompetency. While the contention has not been abandoned formally, it has not been pressed, and the Court finds it to be without merit.

With respect to petitioner's mental incompetency in 1962 to stand trial for the offense allegedly committed in November 1961, the thrust of the argument seems to be not so much that petitioner was in fact mentally incompetent to stand trial but rather that in the circumstances the Circuit Court was required to make a judicial determination of his competency, that no such determination was made, and that its absence voids the conviction. Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815; see also United States ex rel. Robinson v. Pate, 7 Cir., 345 F.2d 691.

The facts in that case were that the defendant, Robinson, was tried to the court without a jury in Illinois on a

charge of first degree murder; his defense was insanity, and his mental condition both at the time of the commission of the alleged offense and at the time of trial were directly in issue in the case. He had a long history of behavior indicating serious mental disease; that history was brought out by testimony in the course of the trial, and four witnesses testified that in their opinion defendant was insane. In the course to the trial the prosecuting attorney conceded that there was doubt as to the sanity of the defendant and suggested that a psychiatrist in the employ of Cook County be called as a witness. Notwithstanding the fact that a statute of Illinois provided that whenever the evidence raises a "bona fide doubt" as to a defendant's competency to stand trial, it is the duty of the judge on his own motion to impanel a jury to pass on the question,[3] the trial judge indicated that it was not necessary for the State to call the psychiatrist, did not impanel a jury to consider the question of Robinson's sanity, and found the defendant guilty without making any specific finding as to his competency to stand trial. Both the Court of Appeals and the Supreme Court held that this action amounted to a denial of due process of law.

The facts in this case are quite different from those in *Robinson*. As far as petitioner's mental competency is concerned, the transcript of the proceedings in the Circuit Court reflects the following:

On November 7, 1961, an information was filed by the Prosecuting Attorney charging petitioner with the crime of rape committed on November 3. On November 28, 1961, it having been made to appear to the Court that petitioner desired counsel and was without means to employ counsel, an order was entered appointing two members of the Hot Springs, Arkansas Bar to represent petitioner without charge. On November 30 those attorneys proceeding under the provisions of Ark.Stats.Ann., § 43-1301 et seq., filed a petition for an order committing petitioner to the State Hospital for observation and report;[4] on the same day the petition was granted and petitioner was committed for a period of not more than one month. Petitioner was delivered to the Hospital authorities on December 1, and the Hospital staff made its report on December 29.

The Hospital report, signed by Dr. E. W. Crow, the examining physician, and approved by Dr. George W. Jackson, the Hospital superintendent, contained a diagnosis of "without psychosis." The report recited that it was the opinion of the examining physician and of the joint psychiatric staff that petitioner "was not mentally ill, to the degree of legal irresponsibility at the time of this mental examination" and "was probably not mentally ill, to the degree of legal irresponsibility at the time of the alleged commission of his acts."[5]

On January 15, 1962, petitioner, still represented by his appointed attorneys, was arraigned and entered a plea of not guilty. No suggestion was made to the Circuit Judge that petitioner was not mentally competent to plead or to stand trial. On February 5 the case was set for trial, but a telegram was received by the Prosecuting Attorney to the effect that Mr. Christopher C. Mercer, Jr., a Negro attorney of Little Rock, had been employed to represent petitioner; accordingly, the setting was cancelled, and the case was passed for the time being. On the same day Mr. Mercer moved for a continuance of the case. That motion was granted, and by agreement the case was set for trial on March 19. At this

---

3. Ill.Rev.Stat., c. 38, § 104–2, referred to in the opinions of both the Supreme Court and of the Court of Appeals.

4. The filing of such a petition is not an uncommon practice in Arkansas in cases involving sexual offenses even where there is no real question as to the sanity of

the defendant; the request may be made as a precautionary measure or at least as a time gaining device.

5. The language of the report tracks the language of the statute. See Trotter and Harris v. State, 237 Ark. 820, 822, 377 S.W.2d 14, 16.

point in the proceedings petitioner's appointed counsel were permitted to withdraw from the case.

Prior to the trial the Circuit Court was not requested to hold any sanity hearing or to take any testimony as to the mental condition of the accused; insanity was not an issue at the trial. No question of petitioner's mental competency was raised in connection with his appeal to the Supreme Court of Arkansas nor in connection with the original habeas corpus proceeding which he filed in this Court.

■ Conceding that Pate v. Robinson, supra, emphasizes that it is a denial of due process of law to put a person to trial on a criminal charge when he lacks the mental competency to stand trial, this Court does not believe that that decision or any other decision makes it the constitutional duty of State trial judges to hold sanity hearings on their own motion simply because there has been a routine pre-trial psychiatric examination of the defendant resulting in a negative report.

■ Certainly, in connection with this successive application for habeas corpus this Court is not willing to hold that the absence of a sanity hearing in the State court deprived petitioner of any federally protected right. It must be remembered that at the trial of the case petitioner was represented by an attorney not only of his own choice but also of his own race. Presumably, if petitioner had been unable to comprehend the nature of the proceedings, to understand the charges against him, or to communicate intelligently with his attorney relative to his defense, that inability would have manifested itself to counsel prior to or during the trial and counsel would have brought the matter to the trial court's attention.

After petitioner's conviction his attorney filed a long motion for a new trial attacking the conviction on 40 grounds; mental incompetency was not one of them.

■ In the course of the pre-trial conference in this case, which was attended by Mr. Mercer although he does not represent petitioner in this case, the queston of petitioner's mental competency to stand trial was discussed to some extent and nothing was said which would indicate that there is any real basis for belief that petitioner was not mentally competent in 1962. Nor is there anything in the reports of the State Hospital Staff or of Dr. Rees, which would form the basis for such a belief. Petitioner may be of somewhat low mentality, but mere mental weakness is not the equivalent of mental incompetency to stand trial or to be held guilty of a crime.

Before discussing the remaining contentions of petitioner the Court considers it advisable in the interest of precision to make some general comments relative to sentencing procedures in the Arkansas courts.

In all non-capital criminal cases, whether felonies or misdemeanors, which are tried to juries, the jury affirmatively fixes within statutory limits the punishment to be imposed. If the jury agrees that the defendant is guilty but is unable to agree on the punishment, it may, if it desires to do so, return the verdict of guilty and request the judge to fix the punishment.

In capital cases the procedure is somewhat different. Under the substantive criminal code of Arkansas the punishment, and the only punishment, provided for a capital offense, such as first degree murder or rape, is death by electrocution. However, by virtue of Act 187 of 1915, which now appears as Ark.Stats.Ann., § 43–2153, a trial jury in a capital case has the right to render a "verdict of life imprisonment in the State penitentiary at hard labor" in lieu of the death penalty. But, if the defendant is found guilty and punishment is not assessed at life imprisonment, the legal penalty is automatically death.

It is thus not correct, strictly speaking, to say that Arkansas juries "impose the death penalty" on anyone. Rather, those juries have the right in a sense to exercise clemency toward particular defendants by assessing the pen-

alty of life imprisonment at hard labor in a capital case.

The Arkansas statutes attacked by petitioner in general and in their application to Negro men convicted of raping white women are Ark.Stats. § 41–3403 and § 43–2153, read together.

■■ The basic argument that it is unconstitutional to inflict the death penalty upon any person for the crime of rape presents a question of law only which has been ruled upon adversely to petitioner by Judge Young and by the Court of Appeals. A possible variant of that basic argument to the effect that it is unconstitutional to permit a jury of twelve people, with responsibility divided among them, to determine ultimately whether a person convicted of a capital crime shall suffer death or be imprisoned for life is likewise rejected by this Court. If a State can constitutionally impose the death penalty for a crime, this Court sees no constitutional objection to permitting a jury rather than a trial judge to decide whether that penalty shall be imposed in a particular case. And in this connection it might be pointed out that the obvious purpose of section 43–2153 is to permit juries to extend a degree of mercy to defendants convicted of capital crimes, not to make the assessment of the death penalty easier or more likely.

The argument is made, however, that in any event it is a denial of due process to permit a jury to make its determination solely by the exercise of its collective discretion without standards or guide lines laid down in the statutes, or judicial decisions, or in the instructions of the court.

It may be conceded that the Arkansas statutes dealing with rape and dealing with capital punishment do not purport to set up any standards by which the jury is to exercise its discretion in determining whether it should exercise the power conferred upon it by section 43–2153, and it will be assumed that no such

standards are to be found in the reported decisions of the Supreme Court of Arkansas. Nor did the Circuit Court in its charge to the jury attempt to lay down any principles which should be applied in determining whether petitioner, if convicted, should be punished by life imprisonment rather than by death.[6]

■ The Court does not think, however, that it is constitutionally necessary for specific standards or guide lines to be laid down or brought to the attention of the jury. Whether a convicted rapist or murderer is to suffer death, on the one hand, or life imprisonment, on the other, rests under Arkansas procedure, within the discretion of the jury, to be exercised in the light of the judgment, common sense, and experience of the jurors. Jurors are presumed to be persons of good judgment and common sense. If they do not know without being told that in determining whether clemency should be extended in a given case they should take into consideration all of the relevant facts and circumstances shown in evidence and should weigh aggravating circumstances, if any, against mitigating circumstances, if any, no useful purpose will be served by telling them.

On this phase of the case petitioner again relies on a very recent Supreme Court decision. Giaccio v. Pennsylvania, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447. Again, his reliance is misplaced.

*Giaccio* involved a peculiar 1860 statute of Pennsylvania which permitted a jury in a misdemeanor case to determine by its verdict whether a defendant acquitted on a misdemeanor charge might nonetheless be taxed with the costs of the prosecution. Giaccio was tried on a misdemeanor charge; the jury found him not guilty but taxed him with the costs. The statute itself prescribed no standards by reference to which the jury was to determine whether an acquitted defendant should be charged with costs. However, Pennsylvania decisions had es-

6. It does not appear that counsel for petitioner requested any instructions on the subject.

tablished that costs were not to be charged against an acquitted defendant unless his conduct had been " 'reprehensible in some respect,' 'improper,' outrageous to 'morality and justice,' or that his conduct was 'not reprehensible enough for a criminal conviction but sufficiently reprehensible to deserve an equal distribution of costs' or that though acquitted 'his innocence may have been doubtful.'" 382 U.S. at page 404, 86 S.Ct. at page 521. The jury was instructed "that it might place the costs of prosecution on the appellant, though found not guilty of the crime charged, if the jury found that 'he has been guilty of some misconduct less than the offense which is charged but nevertheless misconduct of some kind as a result of which he should be required to pay some penalty short of conviction [and] * * * his misconduct has given rise to the prosecution.'" Ibid.

The trial court ultimately held the statute unconstitutional, but the State appellate courts disagreed. There was an appeal to the Supreme Court of the United States, and that Court held the statute unconstitutionally vague notwithstanding the construction which had been placed upon it by the courts of Pennsylvania. In concurring opinions Justices Stewart and Fortas thought it sufficient to say simply that it is unconstitutional to tax the costs of the prosecution against an acquitted defendant.

Evidently, the majority of the Court were not unmindful that it might be contended that the holding would be used to attack the practice prevailing in many States, including Arkansas, of permitting juries finding defendants guilty to fix the punishment within legal limits. And the Court expressly noted that it intended "to cast no doubt whatever on the constitutionality of (that) practice." 382 U.S. at page 405, f. n. 8, 86 S.Ct. at page 522.

It is true that in his concurring opinion Mr. Justice Stewart said (p. 405 of 382 U.S. p. 522 of 86 S.Ct.):

" * * * It seems to me that, despite the Court's disclaimer, much of the reasoning in its opinion serves to cast grave constitutional doubt upon the settled practice of many States to leave to the unguided discretion of a jury the nature and degree of punishment to be imposed upon a person convicted of a criminal offense. Though I have serious questions about the wisdom of that practice, its constitutionality is quite a different matter. * * * *"

Whether the interpretation which Justice Stewart places upon the reasoning of the majority turns out to be accurate remains to be seen; for the present at least this Court will accept the majority's disclaimer at face value. And, the Court thinks that the Arkansas practice, which has been described, falls within the terms of the disclaimer.

The contention which has been urged most seriously here, and which has been ably argued by Professor Amsterdam of the University of Pennsylvania Law School, who is of counsel in the case, is that Arkansas juries customarily apply Ark.Stats.Ann., §§ 41–3403 and 43–2153 in a racially discriminatory and unconstitutional manner to Negro men who have been convicted of raping white women so that a disproportionate number of such defendants receive the death penalty. And it is argued that it makes no difference that the sentence results from negative jury action in failing to assess punishment at life imprisonment rather than from affirmative jury action in voting the sentence of death.

The same contention was made in the State courts and, as indicated, was urged before Judge Young and before the Court of Appeals. In those proceedings petitioner sought to establish his thesis by the use of execution records of the State of Arkansas and by records of sentences imposed in rape cases over a period of time in Garland, Pulaski, and Jefferson Counties. The statistics which petitioner was able to produce in the earlier proceedings were not convincing to the Courts concerned.

In the instant case petitioner relies upon the results of a study made in 1965 by Professor Marvin Wolfgang, a well

qualified sociologist and criminologist on the faculty of the University of Pennsylvania. Dr. Wolfgang, whose qualifications to testify as an expert are not questioned and are established, testified at the hearing, and a written report prepared by him, together with certain other relevant documentary material, was received in evidence without objection.

The background facts of the Wolfgang study may be summarized as follows:

In early 1965 Dr. Wolfgang was engaged by the NAACP Legal Defense and Educational Fund, Inc. to make a study of rape convictions in a number of southern States, including Arkansas, to prove or disprove the thesis that in those States the death penalty for rape is disproportionately imposed upon Negro men convicted of raping white women. Dr. Wolfgang was apprised of the fact that the results of his study might well be used in litigation such as the instant case.

As far as Arkansas is concerned, Dr. Wolfgang caused Mr. John Monroe, a qualified statistician, to select a representative sample of Arkansas counties with reference to which the study would be made. The sample drawn by Mr. Monroe, who testified at the hearing, consisted of 19 counties in the State.

During the summer of 1965 law students interested in civil rights problems were sent into Arkansas to gather basic data with respect to all rape convictions in the sample counties for a period beginning January 1, 1945, and extending to the time of the investigation. Data obtained as to individual cases were recorded on individual case schedules. When the work was completed, the individual schedules were turned over to Dr. Wolfgang for evaluation.

The investigation brought to light 55 rape convictions during the study period involving 34 Negro men and 21 white men. The offenses fell into three categories, namely: rapes of white women by Negro men; rapes of Negro women by Negro men; and rapes of white women by white men. No convictions of white men for raping Negro women were found.

Dr. Wolfgang found that of the 34 Negroes convicted of rape 10 had been sentenced to death and 24 had been sentenced to life imprisonment; the corresponding figures for the white offenders were 4 and 17. The witness did not consider that particular variation to be of great significance. But he did attach great significance to the fact that of the 19 Negroes convicted of raping white women 9, or nearly 50 percent, had been sentenced to death, whereas in other racial situations only 5 death sentences had been imposed, those 5 sentences representing only about 14 percent of the total sentences imposed in those situations.[7]

Using recognized statistical procedures Dr. Wolfgang undertook to determine whether the differential in the imposition of the death sentence was due to some factor other than the association between Negro offender and white victim. He concluded, and the Court agrees, that the differential could not be due to the operation of the laws of chance.

The witness then proceeded to consider race in relation to certain variables appearing in rape cases,[8] and also to con-

7. The figures just given relate to convictions and sentences imposed. Actually those figures involve some duplications of individuals. The overall record reflects that two Negroes were convicted twice of raping white victims and received the death sentence each time. One Negro was convicted twice of raping two Negro women and received a life sentence in each case. And two white men were each convicted twice of raping two white women; in each instance the original sentence imposed was life imprisonment, and the second sentence was death.

8. Generally speaking, and subject to certain exceptions, the variables appear to the Court to be facts or circumstances which reasonably might be supposed to either aggravate or mitigate a given rape. Variables included, but were not limited to, such factors as age of defendant, age of victim, degree of force, degree of injury, weapon use or display, and marital and family status of offender and victim.

sider sentences imposed in relation to such variables. He found that race had significant associations with certain variables but not with others, but he also found that in general the sentences imposed had nothing significant to do with the variables, other than the combination of Negro offenders and white victims.

Without stopping to go into further detail, the Court will state that it understands Dr. Wolfgang's conclusion to be that a Negro man who is convicted of raping a white woman has about a 50 percent chance of receiving a death sentence, regardless of the facts and circumstances surrounding the crime, whereas a man who is convicted of criminally assaulting a woman of his own race stands only about a 14 percent chance of receiving the death sentence.

Petitioner has made no effort here to show that the individual jury which tried and convicted him acted in his particular case with racial discrimination. Rather, petitioner urges that a showing of a pattern of racial discrimination in the imposition of the death penalty makes a prima facie showing of such discrimination in a particular case; that a failure of an Arkansas jury to assess punishment at life imprisonment in a capital case is tantamount to an assessment of the death penalty; and that it is unconstitutional for a jury to permit a death sentence to be imposed on a Negro man convicted of raping a white woman if it would have assessed a penalty of life imprisonment had the defendant been white and had he raped the same woman in the same or similar circumstances.

In appraising petitioner's contention and in weighing the testimony and report of Dr. Wolfgang the Court lays to one side the fact that in Sims v. Georgia, supra, the Supreme Court has agreed to review, among other things, the question of whether a Georgia trial court committed error in refusing to hear testimony to the effect that during a certain period in Georgia 19 times more Negroes than whites have received the death sentence in rape cases. In this case the Court has heard and considered all of the evidence which petitioner has offered.

While the statistical evidence produced in this case is more extensive and sophisticated than has been produced heretofore the Court is not convinced that it is sufficiently broad, accurate, or precise as to establish satisfactorily that Arkansas juries in general practice unconstitutional racial discrimination in rape cases involving Negro men and white women or to require or justify the inference that the Garland County jury which tried petitioner was motivated by racial discrimination when it failed to assess a punishment of life imprisonment.[9]

The study does not indicate that Negro men convicted of raping white women invariably or even in a majority of cases receive the death penalty. The study covered only 55 cases over a twenty year period in 19 Arkansas counties containing, according to the census of 1960 47 percent of the State's population, and after making allowances for duplications it appears that only 7 Negro men were sentenced to die for raping white women.

9. Garland County was not included in the sample group of counties considered by Dr. Wolfgang. Garland County statistics were before Judge Young in the original habeas corpus proceedings and were summarized in the opinion of the Court of Appeals. Maxwell v. Stephens, supra, 348 F.2d at 330. Those figures revealed that in the ten year period beginning January 1, 1954, seven white men and three Negroes were charged with rape in that county. Two of the victims of the white men were white; the races of the other victims of those men were not disclosed.

The victims of the Negro offenders were two Negro and one white woman. Charges against four of the white men were not pressed; the other three were convicted of lesser crimes. The charges against one of the Negroes was dismissed, and a second was convicted of a lesser offense. The third, petitioner here, was convicted of raping a white woman and received the death sentence. There is no question that the facts and circumstances surrounding his offense were such as to justify the imposition of that sentence entirely apart from any consideration of race.

The case studies, and the number of death sentences imposed are simply too few in number to afford convincing proof of the proposition urged by petitioner.

As to the sample which was considered, Dr. Wolfgang said in his report that the included counties "are a stratified random sample of Arkansas counties, geographically dispersed throughout the State and representative of the State in urban-rural and white-Negro population ratios." Although the sample drawn by Mr. Monroe seems to have been drawn in a manner which is acceptable statistically, the quoted statement of Dr. Wolfgang is simply not correct, and this was recognized by Mr. Monroe and is made clear by an examination of a map of the State attached to the report.

The Negro population of Arkansas is not distributed evenly over the State, nor is the State's overall population distributed evenly from the urban-rural standpoint. An examination of the map which has been mentioned shows that the counties included in the sample are for the most part located in the southern and eastern portions of the State where the Negro population is heaviest and include most of the large urban centers in the State such as the Little Rock-North Little Rock metropolitan area, and the cities of Blytheville, El Dorado, Fort Smith, and Pine Bluff.

The variables which Dr. Wolfgang considered are objective; they are broad and in instances are imprecise. In connection with many of the cases studied the field workers were unable to obtain from available sources information which might have been quite pertinent, and Dr. Wolfgang's statistics really reveal very little about the details of the cases of the 7 individual Negroes who received the death sentence for raping white women as compared to the details of the cases in which other racial situations were involved.

Dr. Wolfgang himself recognizes in his report and in his testimony that his conclusions are subject to attack from certain angles due in large measure to the small number of cases studied and lack of available information in many of those cases. In his report he states frankly:

"This report contains a preliminary analysis of data obtained in a study designed to determine the effect of racial factors upon capital sentencing for rape in the State of Arkansas. The preliminary analysis is neither exhaustive nor conclusive. Its findings, presented below, are tentative and are based upon an exploratory investigation of the available data. Interpreting the results must be done with caution. Subject to this qualification, the preliminary analysis strongly suggests that racial discrimination is operative in the imposition of the death penalty for rape in Arkansas."

On the meager material before it the Court is simply not prepared to convict Arkansas juries of unconstitutional racial discrimination in rape cases. As a matter of fact, the Court doubts that such discrimination, which is a highly subjective matter, can be detected accurately by a statistical analysis such as was undertaken here. Statistics are elusive things at best, and it is a truism that almost anything can be proved by them.

The Court does not intend to belittle either the study made by Dr. Wolfgang or his testimony. But the Court is simply not convinced by them any more than the Supreme Court of Arkansas, Judge Young, and the Court of Appeals were convinced by the materials previously submitted.

In his opinion Judge Young aptly stated that the issue of consent is always involved in rape cases. In cases not involving inter-racial situations the issue of consent may be and frequently is very real; that issue from a factual standpoint is much less likely to be present in cases in which white women have been attacked by Negro men. And the disproportion between death sentences imposed on Negro men convicted in inter-racial cases and such sentences imposed in other cases may well be referable in large measure to the fact that in the former cases the trial jurors may have a firmer and more abiding conviction of

the truth of the charges than in cases of the latter type.

The final contention to be discussed does not involve any Arkansas statute but does involve Arkansas criminal procedure generally. Under that procedure the State puts on its evidence first, and in many types of cases, including rape cases, evidence which is relevant to guilt is also relevant to punishment. When the State has completed its presentation, the defense may or may not introduce evidence, and the defendant may or may not testify in his own behalf. If he does testify, he waives his privilege against self-incrimination with respect to the charge against him, and may be cross examined as fully as any other witness. The deliberations of the jury relate to both the question of guilt and the question of punishment; there is no post-conviction hearing before the jury as to the punishment which the defendant should receive.

Petitioner, who did not take the stand in the course of the trial in the Circuit Court, attacks as unconstitutional the procedure which has been outlined. He alleges that the procedure is unconstitutional because "evidence pertinent to the question of penalty could not be presented without prejudicing the jury against the petitioner on the issue of guilt," and because he could not exercise his constitutional "right of allocution" before the jury which sentenced him, without thereby waiving his privilege against self-incrimination.

In effect, petitioner contends that where a State leaves the matter of punishment to a jury's determination the Constitution requires that the issue of guilt or innocence must be tried out first, and that if the defendant is found guilty, a separate hearing must be held before the jury on the question of punishment in the course of which hearing the defendant can testify as to mitigating circumstances without prejudice to himself since his guilt has been determined already.

While some States follow that procedure, this Court does not believe that the Constitution requires it. The Court does not consider that Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 and Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653, are in point here.

An order denying the petition will be entered forthwith. This Court will not stay petitioner's execution beyond September 2 and will decline to grant a certificate of probable cause to appeal if such a certificate is requested. Petitioner has ample time to apply to the Court of Appeals for relief.